**Wayne D. KLUMP, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 94–309C.

United States Court of Federal Claims.

June 23, 1997.

See also, 108 F.3d 1385.

Wayne D. Klump, Bowie, AZ, appearing pro se.

Andrea I. Kelly, with whom were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and Richard E. Rice, Assistant Director, Washington, D.C., for defendant. Richard R. Greenfield, Office of the Solicitor, United States Department of the Interior, of counsel.

## OPINION

ANDEWELT, Judge.

### I.

In this action, plaintiff, Wayne D. Klump, appearing *pro se,* seeks $489,000 from the Department of the Interior Bureau of Land Management (BLM) for the impoundment and subsequent sale of plaintiff's cattle. The BLM impounded a total of 84 livestock owned by plaintiff, 78 on May 20, 1992, and six on April 13 and 14, 1993, for unauthorized grazing on federally owned land. After the BLM sold plaintiff's cattle at auction, the BLM issued checks to plaintiff for the amount received from the sale less the amount allegedly owed by plaintiff for the unauthorized grazing and less the costs incurred by the BLM for the impoundment and sale of the cattle. Plaintiff refused to accept the checks and instead filed the instant complaint.

In his original complaint, which covers the 78 cattle impounded on May 20, 1992, plaintiff alleges that the BLM's actions violated the prohibition in the Fourth Amendment of the Constitution against unreasonable searches and seizures and the prohibition in the Fifth Amendment against the taking of private property without the payment of just compensation. Plaintiff later amended his complaint to include a claim for compensation for the six additional cattle impounded on April 13 and 14, 1993. The amended complaint is before the court on defendant's motion to dismiss plaintiff's allegation of a Fourth Amendment violation for lack of jurisdiction and for summary judgment on plaintiff's allegation of a Fifth Amendment violation. For the reasons set forth below, defendant's motion to dismiss is granted and

defendant's motion for summary judgment is granted in part.

### II.

■ Defendant is correct that this court lacks jurisdiction to consider plaintiff's allegation of a Fourth Amendment violation. This court's jurisdiction over claims for monetary compensation based on a violation of the Constitution extends only to those constitutional provisions that fairly can be interpreted as mandating compensation for their violation. *United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 954, 47 L.Ed.2d 114 (1976). Binding precedent declares that the Fourth Amendment's prohibition against unreasonable searches and seizures cannot fairly be so interpreted. *Dupre v. United States,* 229 Ct.Cl. 706 (1981).

■ As to plaintiff's allegation of a Fifth Amendment violation, this court possesses jurisdiction over claims based on the Fifth Amendment's takings clause. Therefore, the court must address this claim on its merits. Summary judgment is warranted where there is no dispute as to any material issue of fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c). To evaluate defendant's motion for summary judgment on plaintiff's takings claim, it is necessary to understand the statutory and regulatory framework and the undisputed facts that underlie the BLM's impoundment and sale of plaintiff's cattle.

### III.

The metes and bounds of the Secretary of the Interior's authority to manage federal range lands is described in the Taylor Grazing Act of 1934, as amended, 43 U.S.C. § 315 *et seq.;* the Federal Land Policy and Management Act, as amended, 43 U.S.C. § 1701 *et seq.;* and related grazing regulations set forth in 43 C.F.R. pt. 4100.[1] The regulations in effect at the time of the impoundment and

---

1. The Federal Land Policy and Management Act generally covers the acquisition, disposition, and management of federally owned lands. The Tay-

lor Grazing Act allows cattle to graze on designated public lands but regulates such grazing.

sale of the 78 cattle on May 20, 1992, provide, in part: [2]

The following acts are prohibited on public lands and other lands administered by the [BLM]:

* * * * *

(b) Persons performing the following prohibited acts may be subject to civil and criminal penalties under §§ 4170.1 and 4170.2:

(1) Allowing livestock or other privately owned or controlled animals to graze on or be driven across these [public] lands [and other lands administered by the BLM]:

(i) Without a permit, lease or other grazing use authorization . . . .

43 C.F.R. § 4140.1 (1991). Sections 4150.1 and 4150.3 establish potential damages for unauthorized grazing in violation of Section 4140.1(b), as follows:

§ 4150.1 **Violations.**

Violation of § 4140.1(b)(1) constitutes unauthorized grazing use. Violators shall be liable in damages to the United States for the forage consumed by their livestock, for injury to Federal property caused by their unauthorized grazing use, and for expenses incurred in impoundment and disposal of their livestock, and may be subject to civil penalties or criminal sanction for such unlawful acts.

* * * * *

§ 4150.3 **Settlement.**

The authorized officer shall determine whether the violation is nonwillful, willful, or repeated willful. Where violations are repeated willful, the authorized officer shall take action under § 4170.1–1(b) of this title. The amount due for all settlements shall include the value of forage consumed as determined by paragraph (a), (b), or (c) of this section. Settlement for willful and repeated willful violations shall also include the full value for all damages to the public lands and other property of the United States; and all reasonable expenses incurred by the United States in detecting, investigating, resolving violations, and livestock impoundment costs.

(a) For nonwillful violation: The value of forage consumed . . . .

(b) For willful violations: Twice the value of forage consumed as determined in paragraph (a) of this section.

(c) For repeated willful violations: Three times the value of the forage consumed as determined in paragraph (a) of this section . . . .

These regulations also create procedural safeguards with which the BLM must comply before it may impound and dispose of cattle grazing on government land. These procedures include: (1) written notice of unauthorized use and order to remove the livestock (Section 4150.2); (2) written notice of intent to impound the livestock (Section 4150.4–1); (3) the impoundment of the livestock (Section 4150.4–2); (4) notice of public sale following impoundment (Section 4150.4–3); (5) opportunity for the owner to redeem the impounded livestock prior to sale (Section 4150.4–4); and (6) public sale of the livestock (Section 4150.4–5).

**IV.**

■ For purposes of analyzing defendant's motion for summary judgment, it is necessary to consider separately the impoundment and sale of the original 78 cattle and the subsequent impoundment and sale of the six additional cattle. With respect to the 78 cattle, defendant contends that when impounded, the cattle were grazing on government land without authorization and that the government impounded and ultimately sold the cattle pursuant to and consistent with the applicable regulations. The complaint appears to dispute this argument and implies that the government seized the cattle from land on which the cattle were authorized to graze. The complaint states that the "BLM took or rustled 78 head of plaintiff's Cattle off of the Private Property and other Leasehold property [in] violation of Arizona [statutes]" and that the "BLM used armed gunmen to cut the fence and drive the cattle

---

**2.** The regulations in effect at the time of the impoundment and sale of the remaining six cat-

tle in April 1993 are substantially similar to those in effect on May 20, 1992.

from Arizona to New Mexico." To the extent that federal agents acted in a manner inconsistent with their authority under federal law, plaintiff may not seek redress under the Fifth Amendment's takings clause because the takings clause applies only to authorized government actions. *Florida Rock Indus., Inc. v. United States,* 791 F.2d 893, 898 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987). In any event, the circumstances surrounding the impoundment and sale of the 78 cattle were addressed in previous litigation and, based upon the legal doctrine known as collateral estoppel or issue preclusion, plaintiff may not now contest that the 78 cattle were grazing on federal property and that the government acted pursuant to the applicable regulations.

Plaintiff sought relief with respect to the impoundment and sale of the 78 cattle from an administrative law judge within the BLM and later from the Interior Board of Land Appeals (IBLA). *Klump v. BLM,* 130 IBLA 119 (1994). After a hearing in which plaintiff was represented by counsel, the IBLA found that: (1) at the time of impoundment, the 78 cattle were "on public lands"; (2) plaintiff did not have a current grazing permit authorizing the grazing of the cattle on the federal land;[3] (3) plaintiff received a notice and order to remove the trespassing cattle (Section 4150.2) and a notice of intent to impound (Section 4150.4–1); (4) when plaintiff failed to remove the cattle, the BLM impounded the cattle (Section 4150.4–2), informed plaintiff of the impoundment and impending sale (Section 4150.4–3), and offered plaintiff an opportunity to redeem the cattle prior to sale (Section 4150.4–4); and (5) when plaintiff did not redeem the cattle, the BLM sold the cattle at auction (Section 4150.4–5) and issued plaintiff a check for $6,230.02, which plaintiff refused to accept, for the amount received from the sale less damages. In its decision, the IBLA rejected plaintiff's argument that the BLM did not satisfy the requirements set forth in the applicable federal regulations and stated:

> There is no evidence that BLM failed to follow any of the required procedures for impounding and selling the cattle found in trespass .... [T]his procedure ensured that Klump had notice at several times prior to the impoundment and sale, and the opportunity of removing the cattle in trespass or establishing that no trespass was occurring or (ultimately) of redeeming the impounded cattle.

*Klump,* 130 IBLA at 139. Plaintiff thereafter contested the BLM's action based on the IBLA's decision in district court under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.,* but the district court upheld the BLM action and the Court of Appeals for the Ninth Circuit affirmed.

In *Kroeger v. United States Postal Service,* 865 F.2d 235, 239 (Fed.Cir.1988) (citing *Thomas v. GSA,* 794 F.2d 661, 664 (Fed.Cir. 1986)), the Court of Appeals for the Federal Circuit stated that a party is precluded from relitigating factual issues resolved against it by an administrative board where:

> (i) the issue previously adjudicated is identical with that now presented, (ii) that issue was "actually litigated" in the prior case, (iii) the previous determination of that issue was necessary to the end-decision then made, and (iv) the party precluded was fully represented in the prior action.

*Id.* at 239; *see also United States v. Utah Constr. & Mining Co.,* 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966) (applying collateral estoppel to findings in

---

**3.** The IBLA explained:

Klump had not been issued a grazing authorization for the grazing season running from March 1, 1992, through February 28, 1993. While Klump had filed an application for grazing use ... it was rejected as explained by BLM in a February 5, 1992, letter because Klump had refused to agree to the requirement to place ear tags on all cattle. BLM stated: "If you wish to graze cattle on the public lands ..., you must first submit properly completed applications ... consistent with the existing terms and conditions for these [lands]." BLM also notified Klump, by letter dated March 12, 1992, that, since it had not received an acceptable application ..., it would not issue a grazing authorization for the 1992/1993 grazing season until the applications were properly completed and any cattle found on the allotments would be considered in trespass.

*Klump,* 130 IBLA at 125.

administrative proceedings where the administrative body was "acting in a judicial capacity" and resolved "disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate"). Each of the four criteria listed in *Kroeger* applies herein with respect to the location of plaintiff's cattle on government land, the lack of grazing authorization, and the BLM's compliance with its regulations. Hence, in evaluating plaintiff's claim of a Fifth Amendment taking, the court must assume that the IBLA's conclusions are correct and that the BLM's actions were pursuant to and consistent with the requirements of the applicable regulations.

## V.

▇ To conclude that the BLM seized and sold plaintiff's cattle pursuant to federal regulations is not the end of the takings inquiry. A federal statute or regulation that interferes with the use of private property can constitute a Fifth Amendment takings if it "goes too far." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922). Courts generally evaluate allegations that actions taken by the federal government pursuant to federal regulations constitute a Fifth Amendment takings on an *ad hoc* basis and consider a variety of pertinent factors, including the character of the government action, the economic impact of the regulation on the property owner and on public land and resources, and the extent to which the regulations interfere with reasonable investment-backed expectations. *See, e.g., Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1030–31, 112 S.Ct. 2886, 2901, 120 L.Ed.2d 798 (1992) (describing the factors to be considered in a "total taking" inquiry); *Penn Central Transp. Co. v. New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). Analysis of the undisputed facts herein demands the conclusion that no Fifth Amendment takings occurred because the applicable regulations are narrowly directed at protecting government land from unauthorized trespass and protecting the economic value of government land without having any unreasonable economic affect on cattle owners, and are fully consistent with the cattle owner's reasonable investment-backed expectations.

▇ Article IV, Section 3, Clause 2, of the Constitution allows Congress to "dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." This authority permits Congress to control the occupancy and use of public land and to protect that land from trespass and injury. *Kleppe v. New Mexico,* 426 U.S. 529, 540, 96 S.Ct. 2285, 2292, 49 L.Ed.2d 34 (1976) (citing *Utah Power & Light Co. v. United States,* 243 U.S. 389, 405, 37 S.Ct. 387, 389, 61 L.Ed. 791 (1917)). The regulations in issue are directed narrowly at that goal. When cattle graze on government land without authorization the cattle, in effect, are trespassing, and by eating government-owned forage are potentially diminishing the value of the government land. To deter such unauthorized infringement of government property rights and to ensure that the government is compensated for any damages resulting from such unauthorized grazing, 43 C.F.R. § 4150.1 establishes sanctions. The deterrence results, *inter alia,* from the potential for the cattle owner having to pay such damages plus increased penalties for willful and repeated conduct. The compensation results from the BLM's ability to recover the value of the forage eaten during unauthorized grazing and the costs incurred in impounding and selling the cattle.

With respect to the economic effect of the regulations, the regulations have the beneficial effect of deterring actions that have an adverse economic impact on public lands. *See Lucas,* 505 U.S. at 1030, 112 S.Ct. at 2901. With respect to economic harm to cattle owners, the regulations are drafted narrowly and reasonably so as to limit any economic effect on cattle owners to that reasonably necessary to accomplish the dual purposes of deterring unauthorized grazing on government land and compensating the United States for damages and expenses when such unauthorized grazing occurs.

The regulations do not affect cattle owners whose cattle do not graze on government land without authorization. Where an owner's cattle do graze on government land with-

out authorization, the regulations require the BLM to provide a written warning to the cattle owner before impounding the cattle and to give the cattle owner an opportunity to redeem the cattle after impoundment and before sale. Where the unauthorized grazing is not willful, the cattle owner's economic liability generally is limited to the value of the forage consumed plus government costs related to impoundment and sale. Where the conduct is willful or willful and repeated, the forage related damages increase respectively to two and three times the value of the forage consumed. These increases, however, are a reasonable and measured effort to deter willful and repeated infringements of government property rights. Where the cattle owner does not redeem the cattle by paying the government's damages and expenses, the regulations permit the auctioning of the cattle, with the cattle owner receiving the auction proceeds less government damages and expenses. This procedure should not bring significant economic harm because properly conducted auctions generally are an effective means for securing market value for the items auctioned. In any event, however, given the opportunities the regulations offer for the cattle owner to redeem his or her cattle prior to auction, any economic loss that the cattle owner may suffer as a result of a reasonably conducted auction ordinarily should be viewed as the product of the cattle owner's voluntary decision not to respond to government notices and not to remove his or her cattle from the government land and/or redeem the cattle by paying damages and expenses caused by the unauthorized grazing.

Finally, and perhaps most fundamentally, the BLM's application of its regulations in the instant case is fully consistent with plaintiff's reasonable investment-backed expectations. Plaintiff apparently acquired his cattle after the regulations in issue were in existence. Hence, plaintiff's reasonable investment-backed expectations necessarily would include his cattle being subject to those regulations in the event his cattle entered government land without authorization. In other words, plaintiff could not "demonstrate that [he] bought [his] property in reliance on a state of affairs that did not include

the challenged regulatory regime." *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1177 (Fed.Cir.1994). Moreover, "[r]egulation of property rights does not 'take' private property when an individual's reasonable, investment-backed expectations can continue to be realized as long as he complies with reasonable regulatory restrictions." *United States v. Locke*, 471 U.S. 84, 107, 105 S.Ct. 1785, 1799, 85 L.Ed.2d 64 (1985). As described above, the regulations in issue would not have interfered with plaintiff's use of his cattle had he removed his cattle from federal lands and the regulations placed reasonable restrictions on plaintiff's access to his cattle when plaintiff allowed his cattle to graze on government land without authorization.

*Hage v. United States*, 35 Fed. Cl. 147 (1996), cited by plaintiff, does not support plaintiff's allegation of a Fifth Amendment taking. In *Hage*, like the instant case, the government impounded privately owned cattle grazing on government land and later sold the cattle at auction. The *Hage* court specifically rejected the plaintiffs' argument that the impoundment and sale of the cattle pursuant to the pertinent regulations would itself constitute a taking. The court explained that "[p]laintiffs must demonstrate that despite the regulations and permit terms and despite the warnings and opportunities to redeem their cattle, defendant's actions still constituted a taking." *Id.* at 178. The sole reason the *Hage* court refused to grant summary judgment against the cattle owners was because the cattle owners had alleged that the government had "created a situation where it was physically and economically impossible to prevent their cattle from wandering and to redeem their cattle after impoundment." *Id.* The instant complaint does not contain any analogous contentions with respect to the 78 cattle impounded on May 20, 1992.

## VI.

One additional point warrants mention. The court fully appreciates the central and crucial role that courts play in protecting citizens against possible abuse of power by the government and its officials. But to say

that the regulations in issue here are reasonable and do not violate the Fifth Amendment's takings clause is not to leave the government free to act in any way it chooses with respect to plaintiff's cattle that stray onto government land. The regulations place important restrictions on government conduct. To the extent the BLM takes final action against a cattle owner under the regulations and the action does not comply with the requirements of the regulations, the cattle owner can seek redress in district court, just as plaintiff had attempted here. *See* 5 U.S.C. § 706. The availability of such suits permits courts to monitor and correct improper governmental actions.

## VII.

 Turning next to the impoundment and sale of the six cattle added in the amended complaint, plaintiff apparently did not contest the BLM's actions with respect to these cattle in the IBLA proceeding and hence the legal doctrine of collateral estoppel or issue preclusion does not bar plaintiff from now presenting his own contentions as to the underlying facts. It is not apparent from the amended complaint, however, that the facts regarding the six cattle are materially different from those discussed above for the 78 cattle. The amended complaint alleges that the cattle walked from plaintiff's land onto government land by passing a cattle guard which did not satisfy the legal requirement for a fence under Arizona state law and for which the BLM is responsible. But this allegation itself would not explain plaintiff's failure to redeem his cattle and would not itself seem sufficient to turn the impoundment and sale of the cattle pursuant to the above-described regulations into a Fifth Amendment takings. To the extent plaintiff alleges that the government acted negligently with respect to the fence, this court lacks jurisdiction over claims sounding in tort. 28 U.S.C. § 1491(a)(1). Because plaintiff is appearing *pro se* and may not be familiar with court procedures, the court will provide plaintiff with one additional opportunity to explain in detail the facts that support his case with respect to the six cattle and why those facts support a different application of the Fifth Amendment's takings clause.

*Conclusion*

For the reasons set forth above, defendant's motion to dismiss plaintiff's claim arising under the Fourth Amendment to the Constitution is granted, and defendant's motion for summary judgment with respect to plaintiff's claim covering the 78 cattle impounded on May 20, 1992, is granted. As to plaintiff's claim covering the six cattle impounded in April 1993, the court will give plaintiff an opportunity to explain in detail the facts that support this claim. Accordingly, on or before July 21, 1997, plaintiff shall file a full statement of his factual contentions concerning the six cattle. On or before August 4, 1997, defendant shall file its response. In addition to addressing plaintiff's claim under the Fifth Amendment's takings clause, defendant shall explain whether plaintiff's recitation of the facts state a claim for illegal exaction. *See Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 605, 372 F.2d 1002, 1007 (1967).

IT IS SO ORDERED.