LOURIE, Circuit Judge.
 

 Maynard Alves appeals from the decision of the United States Court of Federal Claims dismissing on summary judgment his Fifth Amendment “takings” and breach of contract claims.
 
 Alves v. United States,
 
 No. 93-261L (Fed.Cl. Nov. 8, 1996). Because the court did not err in determining that Alves’ allegations established neither a Fifth Amendment taking nor a breach of contract, we affirm.
 

 BACKGROUND
 

 In 1988, Alves purchased the Dean Ranch, located in Eureka County, Nevada. The ranch consists of 48,000 acres owned by Alves in fee and other public lands concerning which the Bureau of Land Management (BLM) issued to him grazing permits pursuant to the Taylor Grazing Act (TGA), 43 U.S.C. §§ 315-315r (1994).
 

 Since at least 1973, livestock from the neighboring Dann Ranch trespassed on the Dean Ranch. The Dann ranch is operated by Mary and Carey Dann, Shoshone Indians who have asserted aboriginal rights in the Dean Ranch and other public lands, including the right to allow their livestock to roam and graze freely. The BLM disputed the Danns’ aboriginal claims in court in 1973. In 1991, after 18 years of litigation, including a ruling from the United States Supreme Court,
 
 see United States v. Dann,
 
 470 U.S. 39,105 S.Ct. 1058, 84 L.Ed.2d 28 (1985), the BLM was granted an injunction against trespass by the Danns’ livestock. However, the BLM has been only partially successful in enforcing the injunction against the Danns because of what Alves refers to as the Danns’ “abusive tactics” and the “politically sensitive” nature of the Danns’ aboriginal claims.
 
 [1]
 

 Alves filed suit in the Court of Federal Claims against the government in 1993, alleging that the Danns’ livestock had destroyed the forage, water works, and other improvements on the Dean Ranch. Alves argued that the BLM’s failure to contain the tres
 
 *1456
 
 pass constituted a Fifth Amendment taking and a breach of contract based on his interpretation of his grazing permits and/or an exchange-of-use agreement
 
 [2]
 
 as contracts.
 

 With regard to Alves’ takings claim, the court determined that the livestock trespass on the public lands over which Alves held grazing permits was not actionable because the grazing permits do not constitute com-pensable “property” under the Fifth Amendment, and that the trespass on Alves’ private property was not a “physical” taking because a permanent physical occupation had not been authorized by the government. While the court did not expressly decide whether the government’s actions constituted a “regulatory” taking, it did set forth the three-factored regulatory taking test,
 
 see infra,
 
 and presumably found no regulatory taking either. With regard to the breach of contract claim, the court determined that the grazing permits were revocable privileges, not contracts. Accordingly, the court granted the government’s motion for summary judgment and dismissed Alves’ claims.
 

 Alves appeals to this court, arguing that the trial court erred in granting the government’s summary judgment motion. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3) (1994).
 

 DISCUSSION
 

 We review a grant of summary judgment by the Court of Federal Claims
 
 de novo. Foley Co. v. United States,
 
 11 F.3d 1032, 1034 (Fed.Cir.1993). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.
 
 See
 
 RCFC 56(c);
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 255, 106 S.Ct. 2505, 2513-14, 91 L.Ed.2d 202 (1986). Whether a taking compensable under the Fifth Amendment has occurred is a question of law based on factual underpinnings.
 
 Bass Enter. Prod. Co. v. United States,
 
 133 F.3d 893, 895 (Fed. Cir.1998) (citations omitted). Contract interpretation is a question of law that we review
 
 de novo. Burnside-Ott Aviation Training Ctr. v. Dalton,
 
 107 F.3d 854, 860 (Fed.Cir. 1997).
 

 A.
 
 The Takings Claim
 

 Alves argues that the court erred by failing to recognize that it is the taking of his grazing “preference,” not his grazing “permit” that is actionable. Alves explains that his grazing preference is a governmentally adjudicated right attaching to his fee simple
 
 (i.e.,
 
 base) property that gives him a priority position in the procurement of grazing permits on adjacent public lands.
 
 [3]
 
 Thus, while Alves concedes that the grazing permits are freely revocable by the government without compensation under 43 U.S.C. § 315b (1994),
 
 [4]
 
 he argues that the underlying grazing preference is a compensable property right. Alves further asserts that the BLM’s failure to abate the livestock trespass constitutes a regulatory taking.
 

 The government responds that the distinction between a grazing “permit” and a grazing “preference” is irrelevant because the two are inexorably linked, and therefore the grazing preference, like the grazing permit, does not constitute a compensable property interest under the Fifth Amendment. The government further asserts that, even assuming that Alves had a compensable property interest in his grazing rights, these rights were not taken or authorized to be taken by the government. Finally, the government emphasizes that it has labored to
 
 *1457
 
 prevent the trespass of the Danns’ livestock for over twenty years, and that it is not an “insurer” against trespass by third parties.
 

 We agree with the government that the distinction between grazing “permits” and grazing “preferences” is irrelevant because neither constitutes a property interest com-pensable under the Fifth Amendment. The Supreme Court’s decision in
 
 United States v. Fuller,
 
 409 U.S. 488, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973) is instructive. In
 
 Fuller,
 
 the government condemned 920 acres of respondents’ fee lands.
 
 Id.
 
 at 489, 93 S.Ct. at 802-OS. During the condemnation proceeding, the parties disputed whether the “value accruing to the fee lands as a result of their actual or potential use in combination with the Taylor Grazing Act ‘permit’ lands” was compensable.
 
 Id.
 
 The Court held “that the Fifth Amendment does not require the Government to pay for that element of value based on the use of respondents’ fee lands in combination with the Government’s permit lands.”
 
 Id.
 
 at 493, 93 S.Ct. at 805. This was so even if this “element of value” would warrant a higher selling price on the open market than would the fee by itself.
 
 Id.
 
 at 491, 93 S.Ct. at 803-04. In addition, the court rejected the argument that Congress intended to make such interests directly com-pensable under the TGA notwithstanding the Fifth Amendment. Specifically, the Court noted that section 315b of the TGA:
 

 make[s] clear the congressional intent that no compensable property be created in the permit lands themselves as a result of the permit. Given that intent, it would be unusual, we think, for Congress to have turned around and authorized compensation for the value added to fee lands by their potential use in connection with permit lands. We find no such authorization in the applicable congressional enactments.
 

 Id.
 
 at 494, 93 S.Ct. at 805.
 

 Implicit in
 
 Fuller
 
 is the notion that grazing preferences that are attached to fee simple property are not compensable property interests under the Fifth Amendment. What is compensable is the fee interest only, divorced from other governmentally-ereated rights or privileges appurtenant to the fee. Thus, the distinction between Alves’ grazing preference and his grazing permit is irrelevant from a Fifth Amendment perspective, and neither constitutes a compensable property interest.
 

 Moreover, Aves fails to show that there has been a regulatory taking of any of his compensable property interests. A taking may occur as a result of a regulatory action that is neither a physical invasion nor a physical restraint by the government when the regulatory action goes “too far,”
 
 767 Third Ave. Assoc. v. United States,
 
 48 F.3d 1575, 1580 (Fed.Cir.1995) (quoting
 
 Pennsylvania Coal Co. v. Mahon,
 
 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922)), that is, when regulation “denies an owner economically viable use of his land.”
 
 Lucas v. South Carolina Coastal Council,
 
 505 U.S. 1003, 1016, 112 S.Ct. 2886, 2894, 120 L.Ed.2d 798 (1992). Determining whether a particular regulatory action goes “too far” and is therefore actionable as a taking under the Fifth Amendment involves consideration of “ad hoc, factual inquiries,”
 
 767 Third Ave.,
 
 48 F.3d at 1580, that focus on “three factors of particular significance: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action.”
 
 Id.
 
 (quoting
 
 Connolly v. Pension Benefit Guar. Corp.,
 
 475 U.S. 211, 224-25, 106 S.Ct. 1018, 1025-26, 89 L.Ed.2d 166 (1986)) (internal quotations omitted). However, Aves’ claim differs from the usual regulatory takings claim because it is premised not on governmental action but on the inaction of the BLM in its failure to abate the trespass by the Danns’ livestock.
 

 The Tenth Circuit sitting in banc has addressed whether the government can be liable under the Fifth Amendment for its failure to regulate animals under its regulatory control. In
 
 Mountain States Legal Foundation v. Hodel,
 
 799 F.2d 1423 (10th Cir.1986) (in banc), plaintiffs brought an action against the BLM arguing that the BLM’s failure to prevent animal trespass on plaintiffs’ lands in violation of the Wild Free-Roaming Horses and Burros Act (WFRHBA), 16 U.S.C. §§ 1331-1340 (1994), constituted a Fifth Amendment taking of the forage consumed by the trespassing animals. The Tenth Circuit was not persuaded. In support of its decision, the court rejected the plaintiffs’ argument that the wild horses at issue were
 
 *1458
 
 “instrumentalities of the government whose presence constitutes a permanent governmental occupation” of the plaintiffs’ property.
 
 Mountain States,
 
 799 F.2d at 1428. The court noted that “of the courts that have considered whether damage to private property by protected wildlife constitutes a ‘taking,’ a clear majority have held that it does not and that the government does not owe compensation.”
 
 Id.
 
 at 1428-29. The court also noted that this rule was consistent with Supreme Court precedent sustaining land-use regulations applying the Court’s three-factor taking test.
 
 See id.
 
 at 1429-30.
 

 This appeal presents an
 
 a fortiori
 
 fact situation compared with
 
 Mountain States.
 
 Under the “majority rule” enunciated by the Tenth Circuit, the trespass of regulated wildlife does not constitute a regulatory taking. This appeal is factually different in that the trespass complained of is by livestock owned and rightfully controlled by private third parties, the Danns. There clearly can be no taking when whatever acts complained of are those of private parties, not the government.
 
 See 767 Third Ave.,
 
 48 F.3d at 1582-83. That the BLM may have had regulatory control over the Danns’ livestock does not change the fact that the livestock are properly controlled in the first instance by the Danns, and that Alves’ complaint is with the Danns, not the government. The government is not an insurer that private citizens will act lawfully with respect to property subject to governmental regulation merely because the government has chosen to regulate with respect to grazing on public lands. This answer also applies to the extent that Alves argues that the trespass and resulting damage to his property constituted a physical taking.
 

 Moreover, the regulations upon which Alves relies to establish a governmental taking show that Alves could not have had an investment-backed expectation that could support the establishment of a taking. The section relating to governmental regulation of trespassing livestock clearly states that the BLM is under no duty to impound trespassing livestock, but merely that it is permitted to do so:
 

 Unauthorized livestock remaining on the public lands or other lands under [BLM] control, or both, after the date set forth in the notice and order to remove sent under § 4150.2
 
 may he impounded
 
 and disposed of by the authorized officer as provided herein.
 

 43 C.F.R. § 4150.4 (1996) (emphasis added);
 
 see also Mountain States,
 
 799 F.2d at 1431 (concluding that the WFRHBA did not interfere with plaintiffs’ distinct investment backed expectations of using its property for grazing cattle). Alves, as a member of the public, is charged with the knowledge of this regulatory provision and therefore is deemed to have understood that the government’s duty to impound trespassing livestock under the TGA is not absolute, but permissive. Moreover, because the “character of the government’s action” is important in a takings analysis,
 
 see 767 Third Ave.,
 
 48 F.3d at 1580, we note that there was no governmental action here at all. The trespass was by the Danns’ livestock. It is also worth noting that the government has not merely turned a blind eye to the trespass of the Danns’ livestock, but instead has fought against the trespass for years, and has attempted to enforce its injunction. The BLM’s failure to do so successfully does not breach any duty owing to Alves, and does not constitute a taking under the Fifth Amendment.
 

 B.
 
 The Breach of Contract Claim
 

 Alves also argues that the court erred in dismissing his breach of contract claim based on his grazing permits. Alves asserts that the court should have addressed his argument that a breach of contract arose from his exchange-of-use agreement with the BLM, coupled with the course of dealing between the parties.
 
 [5]
 
 He notes that the
 
 *1459
 
 agreement states that the “Secretary of the Interior may exercise the same livestock regulation and control” over Alves’ land as it does over public lands. Alves asserts that under 43 C.F.R., subpart 4150 (1996), the BLM is obligated to abate livestock trespass on federal lands, and by operation of the “promise” in the exchange-of-use agreement was contractually bound to do likewise on Alves’ land.
 

 The government responds that the plain language of the exchange-of-use agreement cannot be construed as a promise on the part of the BLM to abate livestock trespass. At best, according to the government, it gives the BLM the discretion to do so.
 

 We agree with the government that the exchange-of-use agreement does not constitute a promise on the part of the BLM to abate the trespass of livestock. The specific language of the agreement states that the Secretary “may” regulate Alves’ lands as if they were public lands. This language is discretionary and does not give rise to a governmental duty to abate livestock trespass. Furthermore, as we have already noted, the regulation-that Alves argues binds the government states that the BLM’s obligation to impound trespassing livestock is also merely permissive.
 
 See
 
 43 C.F.R. § 4150.4 (1996) (quoted supra). In addition, Alves’ attempt to vary the clear meaning of the exchange-of-use agreement in accordance with the parties’ “course of dealing” is improper under the parol evidence rule.
 
 See McAbee Constr., Inc. v. United States,
 
 97 F.3d 1431, 1435 (Fed.Cir.1996) (noting that when consideration of parol evidence is proper, such evidence can only be used to supplement the agreement by consistent additional terms). Finally, even assuming that the course of dealing between the parties is somehow relevant to a governmental contractual obligation, Alves presents no evidence concerning how this course of dealing supports an absolute duty on behalf of the government to abate livestock trespass. Therefore, the government was not in breach of the exchange-of-use agreement and the court did not err in granting summary judgment with respect to Alves’ breach of contract claim.
 

 To summarize, Alves’ allegations do not give rise to governmental liability for breach of contract or for a Fifth Amendment taking. If anything, Alves’ allegation that the government has failed in its duty to regulate livestock under the TGA sounds in tort. Such allegations are properly brought under the Federal Torts Claims Act,
 
 see
 
 28 U.S.C. §§ 2671-2680 (1994). However, we express no view on whether Alves’ allegations could establish governmental tort liability. To the extent that Alves’ allegations sound in tort, the Court of Federal Claims lacks jurisdiction under the Tucker Act to determine this question,
 
 see
 
 28 U.S.C. § 1491(a)(1) (1994).
 

 We have considered Alves’ other arguments and have determined that they are without merit.
 

 CONCLUSION
 

 The Court of Federal Claims did not err in determining that Alves could not as a matter of law establish governmental liability under either the Fifth Amendment or for breach of contract. Accordingly, the decision of the court is
 

 AFFIRMED.
 

 [1]
 

 . Alves explains this sensitivity and the Danns' tactics in his opening brief:
 

 Billy Templeton, state director of the BLM at the time this lawsuit was filed, received voluminous letters from supporters of the Dann sisters, from as far away as Germany. The Dann sisters have won the "alternative Nobel” prize[] for their supposed efforts to preserve Indian culture. Their illegal turn-outs are covered by the press, and their struggle against the BLM was the subject of a film narrated by Robert Redford____ Templeton explained BLM inaction by stating that the situation is "sensitive.”
 

 Alves’ Opening Brief at 5-6.
 

 [A] single confrontation between federal agents, BLM personnel, and [Dann supporters] resulted in the BLM becoming wishy-washy. When officials tried to load animals into trucks, Carrie Dann placed her own body into the loading chute. And when the Dann sisters' brother, Clifford Dann, threatened to immolate himself with gasoline, the BLM backed off. Clifford Dann tossed gasoline on Federal officers, and ultimately went to prison for this assault.
 

 Id.
 
 at 8.
 

 [2]
 

 . An "exchange-of-use” agreement is similar to a grazing permit. As explained in the regulations:
 

 [a]n exchange-of-use grazing agreement may be issued to an applicant who owns or controls lands that are unfenced and intermingled with public lands in the same allotment when use under such an agreement will be in harmony with the management objectives for the allotment and will be compatible with the existing livestock operations____
 

 43 C.F.R. § 4130.6-1 (1996).
 

 [3]
 

 .
 
 "Grazing preference
 
 or
 
 preference
 
 means a superior or priority position against others for the purpose of receiving a grazing permit or lease. This priority is attached to base property owned or controlled by the permittee or lessee.” 43 C.F.R. § 4100.0-5 (1996) (emphasis in original);
 
 see also
 
 43 U.S.C. § 315m (1994).
 

 [4]
 

 . "[G]razing privileges recognized and acknowledged shall be adequately safeguarded, but the ... issuance of a permit pursuant to the provisions of this subchapter shall not create any right, title, interest or estate in or to the lands.” 43 U.S.C. § 315b (1994).
 

 [5]
 

 . We are mindful that Alves has also argued, improperly for the first time in his reply brief to this court, that an implied contract arose between him and the government. In addition, Alves’ reply brief takes a view completely inconsistent with that in his opening brief as to the relevance of the exchange-of-use agreement to his breach of contract claim.
 
 Compare
 
 Alves’ Opening Brief at 44 ("[Alves does] not rely upon the permits or leases as the contractual basis for his claims. Rather, he reliefs] upon the
 
 'exchange
 
 of use’ agreement and the course of dealing thereunder”)
 
 with
 
 Alves’ Reply Brief at 4 (“The contract theory of recovery is not based upon the ... 'exchange of use’ agreement.”). We will address his exchange-of-use contract the-
 
 *1459
 
 oiy because it is the only argument properly raised in his opening brief.