Barry BRADSHAW and Norma
Bradshaw, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 98–708L.

United States Court of Federal Claims.

Filed: Feb. 29, 2000.

Published: Sept. 15, 2000.

Glade L. Hall, Reno, Nevada, for the Plaintiffs.

Dorothy R. Burakreis, Environmental and Natural Resources Division, United States Department of Justice, Washington, D.C. with whom on the brief were Eric C. Olson, Department of Agriculture, and Kimberly Fondran, and Christopher D. Fontecchio, Department of the Interior.

## OPINION

MARGOLIS, Senior Judge.

This takings case is before the court on defendant's motion to dismiss or alternatively for summary judgment. Plaintiffs, owners of a ranch in Nevada, seek compensation under the Fifth Amendment for deprivation of property rights that they claim to own. The property rights that plaintiffs claim to own include water rights in springs located on public lands; ditches and right-of-ways to water on public lands; grazing and forage rights on public lands; improvements made on public lands; heads of cattle; damage to their ranch by feral horses; and the loss of economic viability of their entire ranch due to the government's activities and regulatory acts. Defendant argues that as a matter of

law, plaintiffs do not own any property for which they can be compensated.

After a full briefing and oral argument, the defendant's motion for summary judgment, is granted-in-part and denied-in-part.

## FACTS

Plaintiffs, Barry and Norma Bradshaw, are the owners of a 1,000 acre ranch located in East Central Nevada ("the Ranch"). Plaintiffs purchased the Ranch in 1990. Plaintiffs claim that the Ranch has been in operation since 1867. The Ranch is surrounded by public lands administered by the United States Forest Service and the Bureau of Land Management ("BLM"). The public lands are divided into grazing "allotments," and some of these allotments abut plaintiffs' unfenced or partially-fenced private property.

Plaintiffs claim that at the time they acquired the Ranch, they also acquired rights to water appurtenant to the Ranch, and plaintiffs claim that these water rights were lawfully acquired by their predecessors-in-interest. The springs in which plaintiffs claim to have prior rights are situated over a large tract of land managed by the United States Forest Service and the BLM. Most of these springs are located within the Blackrock and Duckwater Allotments, upon which plaintiffs have had grazing permits. Plaintiffs further claim to own the right to construct and maintain ditches and build improvements surrounding those springs.

The State Engineer's Office records show that the rights plaintiffs claim on federal lands are unadjudicated claims of vested rights, and in two instances, permitted rights.[1] The State of Nevada has not commenced an adjudication of water rights within the basin where plaintiffs' vested rights are located. Accordingly, neither the Forest Service, nor BLM has yet filed claims of vested stockwater rights under the Executive Order of April 17, 1926, Public Water Reserve No. 107.

The same tract of land was used by plaintiffs' predecessors-in-interest to graze livestock owned by the Ranch's owners since

---

1. Nevada water law is discussed more fully below.

1867. Plaintiffs assert that in 1907, grazing permits were issued in recognition of the prior regular use of the rangelands adjacent to the Ranch and in recognition of its vested stockwater rights established by prior appropriation. From the time the Ranch was begun, the livestock on the Ranch drank from the springs located on the federal lands and grazed on the forage surrounding those springs.

The controversy leading up to this lawsuit began in 1995 when plaintiffs' permit to graze cattle on the Blackrock Allotment (located within the Humboldt National Forest) was canceled because of their failure and refusal to pay grazing fees. Plaintiffs claimed to need no permit because they had acquired a property right to graze based on historic grazing by their predecessors-in-interest. After the permit was canceled, plaintiffs continued to graze their cattle on the public lands within the Blackrock Allotment. The Forest Service sought injunctive relief against this continued trespass, which was granted in *United States v. Barry Bradshaw*, CV–N96–176–DWH (D.Nev.1996) (slip op.), in spite of plaintiffs' argument that their actions did not constitute a trespass.

After plaintiffs paid the fines associated with the trespass, a new grazing permit was issued on May 16, 1996 authorizing seasonal grazing use from June 9, 1995 to June 8, 2005 on lands within the Duckwater Allotment. From this time on, plaintiffs' and defendants' views of the facts diverge.

Defendant alleges that plaintiffs repeatedly trespassed on the Duckwater Allotment in violation of their grazing permit. Plaintiffs deny this allegation, claiming to have been using only the forage and the water that they owned. BLM concluded that these unauthorized use violations were willful trespass violations and on May 9, 1997 fined plaintiffs $3,399.70. Plaintiffs denied that they were trespassing, but paid the fine on March 31, 1998 after losing a protest filed with the BLM as well as an appeal of the decision.

Despite the BLM decision, plaintiffs continued to allow their cows to graze on the public lands. On March 11, 1998, BLM issued to plaintiffs a Notice of Proposed Decision to cancel 25% of permitted cattle numbers for a three-year period, along with a Notice of Intent to remove unauthorized livestock. The Proposed Decision became final effective on April 27, 1998. BLM issued another trespass notice as a result of its March 18, 1998 finding that 104 cattle were grazing in an unauthorized area. Plaintiffs once again denied that they were trespassing.

On March 31, 1998, BLM impounded plaintiffs' unauthorized cattle. After plaintiffs paid $18,000 in fines owed for the various trespass violations issued, the cattle were released to them. Ultimately, BLM permanently canceled plaintiffs' grazing permit on June 5, 1998. Plaintiffs' appeal of this decision is still pending.

Defendant claims that the cattle, up to as many as 220 head at a time, were in continuous trespass from April 1996 until March 31,1998. Plaintiffs dispute this assertion, claiming that BLM agents consistently failed to distinguish between plaintiffs' unfenced private property and public lands.

In August 1998, after the permit was canceled, BLM conducted a second impoundment of 45 cattle belonging to plaintiffs. Plaintiffs objected to the impoundment on the ground that the cattle were rightfully exercising their right to forage and water and that the cows should never have been impounded in the first place. Despite plaintiffs' objection, the cattle were sold at auction on August 11, 1998. BLM then demanded that plaintiffs pay the outstanding fines and costs, less the amount collected at the public sale.

Plaintiffs further allege that BLM has allowed uncontrolled growth and overgrazing by feral horses. Plaintiffs contend that the horses consumed the forage on the lands on which plaintiffs' cows were permitted to graze, thus forcing plaintiffs to graze their cattle in unauthorized areas. Plaintiffs also allege that the horses have caused damage to their private property. Defendant admits that there were excess wild horses in the area, but asserts that it was unable to remove them until an appropriate management level had been established. Plaintiffs deny this assertion. Defendant disputes that the

government took plaintiffs' property by allowing feral horses to graze there, in that they dispute that plaintiffs owned any property that could be taken because plaintiffs never had an exclusive privilege to graze on the allotment. Plaintiffs deny this allegation. Furthermore, defendant argues that, as a matter of law, plaintiffs are not entitled to compensation for damage caused by the wild horses. Plaintiffs dispute this argument as well.

Plaintiffs filed their complaint in this case on September 4, 1998 seeking compensation under the Fifth Amendment, asserting that defendant took their property. Defendant then filed the instant motion to dismiss, or alternatively, for summary judgment.

### DISCUSSION

### I. STANDARD FOR TAKINGS CASES

 The Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. This amendment has been interpreted to mean that the government owes compensation whenever it takes private property rights, whether by regulation or by physical presence on the land. See e.g. Hendler v. United States, 952 F.2d 1364, 1373–74 (Fed.Cir.1991). In a takings case, the Court must determine the following issues: whether a plaintiff holds the claimed property rights; the scope of those rights; and whether governmental action has deprived the plaintiff of those rights. See Store Safe Redlands Associates v. United States, 35 Fed.Cl. 726, 728 (1996).

### II. PLAINTIFFS' COMPENSABLE PROPERTY INTERESTS

To defeat defendant's motion, plaintiffs must first demonstrate that they possessed a legally cognizable property interest at the time of the alleged taking. See Store Safe Redlands, 35 Fed.Cl. at 734. Only after plaintiffs have proven that they indeed own the property in question will the Court address the scope of those rights and whether the rights have been taken by government action.

### A. Water Rights and Ditch Right of Way

 Plaintiffs claim that they have acquired by prior appropriation rights in the following areas: Ike Spring, Big Ike Spring, Little Ike Spring, Lower Ike Spring, Blackrock Spring, Vanover Spring, Box Spring, Sawmill Spring, Limerock Spring, Bull Spring, Cherry Spring, Freeland Spring, Silver Spring, Mustang Spring, Birch Spring, Willow Spring, Indian Spring, Leona Spring, Unnamed Springs in Sections 34 and 14, and all waters flowing from these various springs. Plaintiffs claim that their predecessors acquired stockwatering rights in these springs in 1867, the year that the Ranch began operation.

Defendant argues that plaintiffs' rights are, at best, undefined and that in any event, any alleged rights do not include a right to forage or an easement to use of the Springs located on the public lands. Defendant, however, admits that plaintiffs do possibly have some water rights. Defendant acknowledges that the State Engineer's Office records show that the rights plaintiffs claim on federal lands are unadjudicated claims of vested rights, and in two instances, permitted rights.

Nevada currently uses the doctrine of prior appropriation. See United States v. Humboldt Lovelock Irr. Light & Power Co., 97 F.2d 38, 42–44 (9th Cir.1938). Water is appropriated when it is used for a beneficial use, including stockwatering. See N.R.S. § 533.490 (1997). A permitted right is issued by the State Engineer if a permittee is able to demonstrate that the water has been appropriated. See N.R.S. § 533.425 (1997). Under Nevada law, a vested water right is one that was used continuously prior to 1905 to the present and is specifically protected by statute. 6 WATERS AND WATER RIGHTS at 500 (1994) (citing N.R.S. § 533.085). If more than one entity is claiming water from the same source, the State can institute an adjudication proceeding to determine who has priority.

The 1866 Mining Act grants two possessory rights: (1) the right to the use of water for mining, agricultural, manufacturing, or other purposes, if the same are recognized

and acknowledged by the local customs, laws, and the decisions of courts; and (2) a right of way for the construction of ditches and canals for the purposes specified. *See* 43 U.S.C. § 661.

Defendant seeks to have this Court decide exactly what the scope of any rights plaintiffs may have under the 1866 Act. This Court declines to do so at this time. If plaintiffs can prove that they do own compensable water rights on the public lands, then this Court will address the issue of the scope of those rights.

Because plaintiffs may be able to prove at trial that they have water rights that are recognized under Nevada's prior appropriation doctrine, and a right of way for the construction of ditches, this Court finds that defendant's motion must be denied on these issues.

## B. *Grazing and Forage Rights*

### 1. *Permit*

■ Defendant apparently believes that plaintiffs are claiming that the cancellation of their grazing permit constitutes a taking. The Court does not so interpret plaintiffs' claims. Nowhere in their answering brief do plaintiffs claim that the cancellation of their grazing permit is a taking. Instead, they claim: (1) that they have a vested right to forage in the areas in which they have water rights and (2) an historic grazing preference based on their predecessor's grazing practices, neither of which constitutes a taking of a grazing permit.

To the extent, however, that plaintiffs are claiming that the cancellation of their grazing permit is a taking, defendants' motion for summary judgment is granted. A grazing permit is a right created by the government, and was never intended to be a compensable property right. *See Alves v. United States,* 133 F.3d 1454, 1457 (Fed.Cir.1998) (affirming the trial court's decision that grazing permits do not constitute compensable "property" under the Fifth Amendment); *see also United States v. Fuller,* 409 U.S. 488, 492, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973) (holding that the jury in a condemnation case could not take into consideration the value of the grazing permit in determining just compensation for

the property because the government cannot be required to compensate for value that it itself created); Taylor Grazing Act of 1934, 43 U.S.C. § 315(b) (providing that the issuance of a grazing permit does not grant any right, title, interest, or estate in or to lands held by the United States).

### 2. *Historic Rights*

■ Like the plaintiff in *Alves,* plaintiffs here argue that they have a right to graze on the public lands because their predecessors acquired that right under Nevada common law. The Federal Circuit rejected this argument in *Alves,* holding instead that the distinction between a grazing preference (the historic right) and a grazing permit was irrelevant for Fifth Amendment purposes. *Alves,* 133 F.3d at 1457. According to the Federal Circuit, neither the grazing permit, nor the historical grazing preference is a compensable interest under the reasoning set out by the Supreme Court in *Fuller* that the government cannot be required to compensate for value that it created.

Defendant acquired the land in question in 1848 under the treaty of Guadalupe–Hidalgo, 9 Stat. 922 (1848). The Supreme Court has consistently ruled that any grazing allowed on the public lands was allowed by "tacit consent" under an "implied license" and was suffered only so long as the government did not withdraw its consent. *See Light v. United States,* 220 U.S. 523, 535, 31 S.Ct. 485, 55 L.Ed. 570 (1911) (citing *Buford v. Houtz,* 133 U.S. 320, 10 S.Ct. 305, 33 L.Ed. 618 (1890)). The government's failure to object to the grazing in the years prior to the Taylor Grazing Act "did not confer any vested right on the complainant, nor did it deprive the United States of the power of recalling any implied license under which the land had been used for private purposes." *Id.* Congress is charged with the preservation of the public lands and "it is not for the courts to say how that trust shall be administered." *Id.* at 537, 31 S.Ct. 485. This Court cannot compel Congress "to set aside the lands for settlement, or to suffer them to be used for agricultural or grazing purposes, nor interfere when, in the exercise of its discretion, Congress establishes a forest reserve for

what it decides to be national and public purposes." *Id.*

Accordingly, this court grants defendant's motion for summary judgment on the issue of the taking of plaintiffs' grazing rights.

### C. *Improvements Made on U.S. Land*

■ Plaintiffs contend that as a result of the denial of their grazing permits and ejectment from the federal lands, they have been deprived of the use and benefit of improvements they created upon the federal lands. Defendant disputes this allegation, claiming instead that plaintiffs have not created any such improvements. This is a factual issue that cannot be decided by summary judgment.

### D. *Damage by Feral Horses*

■ Plaintiffs allege that BLM has allowed feral horses to overrun the public lands upon which it had grazing permits. These feral horses have allegedly caused damage to plaintiffs' Ranch, to the improvements they claim to have made on the public lands, and to the springs in which they claim to have rights. The feral horses also allegedly ate the forage located on the public lands, which plaintiffs claim the right to under a grazing allotment, leaving their cattle with nothing to graze.

The Federal Circuit, addressing a similar issue in *Alves v. United States*, 133 F.3d 1454, cited with approval the Tenth Circuit's opinion in *Mountain States Legal Foundation v. Hodel*, 799 F.2d 1423 (10th Cir.1986) (en banc). In *Mountain States*, plaintiffs were alleging that BLM's failure to prevent animal trespass on plaintiffs' lands in violation of the Wild Free–Roaming Horses and Burros Act, 16 U.S.C. §§ 1331–1340, constituted a Fifth Amendment taking of the forage consumed by the animals. *Mountain States*, at 1425. The court rejected this argument. The court found that the wild horses were not "instrumentalities of the government whose presence constitutes a permanent governmental occupation" of plaintiffs' property. *Id.* at 1428. Relying on a litany of cases where courts have determined that damage to private property by protected wildlife does not constitute a tak-

ing for which the government owes compensation, *id.* at 1428–29, the court concluded that regulation of the wild horses is a land-use regulation that is "reasonably related to the promotion of the public interest," and thus not a compensable taking. *Id.* at 1430. The Supreme Court in *Kleppe v. New Mexico*, 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976), in upholding the Wild Free–Roaming Horses and Burros Act, recognized the important governmental interest inherent in the protection of the wild horses and burros roaming the public lands. *See Kleppe*, 426 U.S. at 535–36, 96 S.Ct. 2285. "The provisions of the [Act] advance this important governmental interest." *Mountain States* at 1430.

This Court agrees with the analysis set forth in *Kleppe, Mountain States,* and *Alves.* Accordingly, defendant's motion is granted on this issue. Even assuming plaintiffs do have property rights on the federal lands, defendant is not liable to plaintiffs for damage caused by the feral horses because the feral horses are not instrumentalities of the government and because the regulation "is a land-use regulation that is reasonably related to the promotion of the public interest." *Id.*

### E. *Impounded Cattle*

Defendant urges this Court to grant its motion for summary judgment denying plaintiffs compensation for the cows that were impounded. After consideration of defendant's arguments, this Court grants the motion. Defendant claims that the cows were impounded on March 31, 1998 and again on August 4–5, 1998 because of their continual trespass on federal lands without authorization since 1995. The plaintiffs respond that at times, cattle that were alleged to be trespassing were actually on plaintiffs' own unfenced private property. Plaintiffs, however, have admitted that the cows that were impounded in March and August 1998 were located on the public lands and not on plaintiffs' private property at the time of the taking.

#### 1. *Threshold Jurisdictional Issue*

■ To the extent that plaintiffs are alleging that the government acted improperly

and impounded cows which were not trespassing on government property, there is a jurisdictional issue this Court must address. The Court of Federal Claims does not have jurisdiction over claims sounding in tort. *See Davis v. United States*, 35 Fed.Cl. 392, 395 (1996). If plaintiffs are claiming that defendant tortiously took their cattle, then plaintiff can bring an action in tort in U.S. District Court. Tort is not their only remedy, however. Where the government has taken property improperly, the taking gives rise to two violations of the property owner's rights, and the property owner may choose which of those two causes of action it wishes to pursue. *See Del–Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1363–64 (Fed. Cir.1998) ("The two separate wrongs give rise to two separate causes of action, and the property-owner may elect to sue for just compensation or to seek relief for the legal improprieties committed in the course of the taking.... [T]here is no sound reason why the claimant might not waive that right [to sue in trespass], and electing to regard the action of the government as a taking under its sovereign right of eminent domain, demand just compensation.").

Plaintiffs in this case have apparently waived their tort claim or are not asserting it here and are not contending that defendant's actions in taking the cattle were unlawful. Thus, this Court has jurisdiction to hear plaintiffs' taking claims. *See e.g. Osprey Pacific Corp. v. United States*, 41 Fed.Cl. 150, 157 (1998) ("It is hardly a defense for the government to say it was wrong. A plaintiff may elect to come to this court for monetary damages as long as [it is] not challenging the government's actions.").

### 2. *Compliance With Regulations*

■ Defendant asserts that the impoundment of the cattle cannot constitute a taking because it was done pursuant to the regulations set out in 43 C.F.R. pt. 4100. Addressing a similar claim, the Court in *Klump v. United States*, 38 Fed.Cl. 243 (1997) held that the regulations concerning impoundment of cattle found in the Federal Land Policy and Management Act, 43 U.S.C. § 315, *et seq.*, and the related grazing regulations were "narrowly directed at protecting government land from unauthorized trespass and protecting the economic value of government land without having any unreasonable economic affect on cattle owners, and are fully consistent with the cattle owner's reasonable investment-backed expectation." *Klump*, at 248. The court in *Klump*, found that the undisputed facts clearly showed that BLM complied with all of the narrowly tailored regulations, and thus was not a taking. *See id.*

To the extent that plaintiffs are accepting BLM's agents actions as lawful, the impoundment of the cattle cannot constitute a taking. Congress has the authority "to control the occupancy and use of public land and to protect that land from trespass and injury." *See Klump*, at 248. These regulations are narrowly tailored to meet that goal. Cattle which are lawfully on government land are not impounded. *See id.* Where an owner does graze cattle on public lands without proper authorizations, the regulations provide for ample notice to the cattle owner prior to impoundment and for an opportunity to redeem the cattle once they are impounded. *See id.* at 249. The cattle are sold at auction only after the owner has failed to redeem them. *See id.* Plaintiffs in this case had opportunity to remove their cattle from the public lands to avoid impoundment, and to redeem the cattle once they were impounded. Indeed, they did redeem their cattle after the March 31 impoundment. Their failure to do so following the August 4–5, 1998 impoundment does not constitute a compensable taking.

### 3. *Defendant's Collateral Estoppel Argument*

The Court has considered defendant's argument that plaintiffs are collaterally estopped to deny their cattle trespassed and consumed forage on National Forest lands because of the decision in *United States v. Barry Bradshaw*, CV–N96–176–DWH (D.Nev.1996). In light of the foregoing analysis, this Court finds it unnecessary to decide this issue. Furthermore, the alleged trespass at issue in this case occurred well after the U.S. District Court decision in *United States v. Barry Bradshaw* was rendered.

Accordingly, defendant's motion is granted with regard to the impounded cattle.

### F. *Entire Ranch*

█ The Court understands plaintiffs' final argument to be that because plaintiffs have been denied their grazing privileges and access to their water rights, the Ranch is no longer economically viable. Plaintiffs contend that without access to the forage and water, they are unable to raise cattle, thus rendering the Ranch economically useless.

With regard to the grazing rights, plaintiffs cannot claim that the economic viability of the Ranch has been taken based on the denial of the grazing permit. As set out above, defendant cannot be required to compensate for the loss of value caused by an alleged taking, when it created the value in question. *See United States v. Fuller,* 409 U.S. at 492, 93 S.Ct. 801, 35 L.Ed.2d 16 (holding that the jury in a condemnation case could not take into consideration the value of the grazing permit in determining just compensation for the property because the government cannot be required to compensate for value that it itself created).

With regard to plaintiffs' other arguments, however, the Court leaves open the question as to whether plaintiffs do own compensable water rights within the federal lands. However, whether or not the taking of plaintiffs' claimed water rights, if any, renders the Ranch economically useless is a factual issue which cannot be decided on summary judgment.

Accordingly, defendant's motion for summary judgment is denied with regard to the economic viability of the entire ranch.

### CONCLUSION

For the reasons discussed above, defendant's motion for summary judgment is granted with regard to the denial of the grazing permit, the historical grazing preference, the damage caused by the feral horses, and the impounded cattle. Defendant's motion is otherwise denied.