**Wayne D. KLUMP, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 94–309C.**

United States Court of Federal Claims.

Oct. 16, 2002.

---

Wayne D. Klump, Bowie, Arizona, appearing pro se.

Mark L. Josephs, Esq., U.S. Department of Justice, Washington, D.C., with whom was Assistant Attorney General Robert D. McCallum, Jr.

## OPINION

ALLEGRA, Judge.

"Two wrongs do not make a right. Two wrongs simply make two wrongs."[1]

This case is before the court following trial in Tucson, Arizona. Plaintiff's cattle were grazing illegally on Federal land without a permit. The Bureau of Land Management (BLM) eventually impounded the cattle and sold them at auction. Under the BLM regulations, plaintiff is owed the difference between the auction price for the cattle and the costs associated with the impoundment and sale thereof. Plaintiff, however, asserts that the costs billed by the BLM against the sale proceeds were grossly excessive and inadequately documented.

The court cannot condone plaintiff's actions in allowing his cattle to graze where they legally did not belong. Nor, based on the record, does the court believe that plaintiff has been a model citizen in his dealings with the BLM. But, plaintiff's conduct, whether contumacious or not, did not give the BLM the *carte blanche* to charge excessive and unwarranted costs against the auction proceeds—and the evidence presented at trial indicates that it did.

## I. FACTS[2]

Wayne D. Klump ("Mr. Klump" or "plaintiff") is a veteran cattle rancher, whose ranch is in southeastern Arizona. Plaintiff's land lies relatively near the Badger Den Allotment No. 51100 (the Allotment), which is owned by the United States and managed by the BLM. Originally, plaintiff and his brother possessed a permit to graze their cattle on the Allotment.[3] But when the conditions on that permit were violated, the permit was cancelled. As a consequence, plaintiff was no longer authorized to graze livestock on the Allotment and, accordingly, any of plaintiff's livestock left on the Allotment were viewed by the BLM as trespassing and subject to impoundment.

On or about May 8, 1992, the BLM issued a notice of impoundment of the Allotment to Mr. Klump, his brother, Luther, and others. Mr. Klump and his brother subsequently appealed the BLM orders to the Interior Board of Land Appeals (IBLA), which, on February 5, 1993, dismissed his case. On February 18, 1993, the BLM ordered plaintiff to remove his livestock from the Allotment, warning that any livestock that remained after the allowed removal period would be impounded. On April 13 and 14, 1993, after other regulatory notices were given, the BLM impounded the livestock still on the Allotment—289 head of the impounded cattle belonged to plaintiff's brother and others; ten of the cattle belonged to plaintiff.[4] On April 22, 1993, plaintiff's cattle were sold at auction, netting $3,442.10 after costs were subtracted for transportation, care and feeding, veterinarian, sales commission, and brand inspection.[5] The agency then subtracted from the net proceeds plaintiff's ratable share of the impoundment costs of $1,526.50 and trespass fees of $89.72, leaving an amount due plaintiff of $1,825.88. The BLM issued a series of checks to plaintiff, each in the amount of $1,825.88, but Mr. Klump refused to cash any of these checks, at least in part, because he felt that they inadequately compensated him for the loss of his cattle.

1. *Minnick v. California Dep't of Corrections*, 452 U.S. 105, 128 n. 3, 101 S.Ct. 2211, 68 L.Ed.2d 706 (1981) (Stewart, J., dissenting).

2. Additional background facts concerning this matter may be found in this court's earlier unpublished opinion of May 3, 2001, and are incorporated herein by reference. Further background may be found in an opinion rendered by this court in the related case filed by defendant's brother, Luther. *See Klump v. United States*, 50 Fed.Cl. 268 (2001), *aff'd*, 30 Fed.Appx. 958 (Fed. Cir.2002).

3. This permit was issued under the 1934 Taylor Grazing Act, 48 Stat. 1269, 42 U.S.C. § 315, *et seq*. For an excellent discussion of the conflicts over western grazing land and water that led to the Taylor Act's enactment, *see Public Lands Council, et al. v. Babbitt*, 529 U.S. 728, 731–33, 120 S.Ct. 1815, 146 L.Ed.2d 753 (2000).

4. While plaintiff's amended complaint referred to six cattle, the record in this case, including both plaintiff and defendant exhibits, clearly indicates that ten cattle were involved.

5. Plaintiff contends that his cattle were sold at below market prices. Two facts belie this claim. First, the relevant facts demonstrate that the cattle were sold at a true auction. Second, according to several charts in the record, the prices that plaintiff claims he should have received for his cattle are essentially what he actually received.

Later in 1993, plaintiff and his brother appealed the IBLA's decision to the United States District Court for the District of Arizona. That court, on April 21, 1994, upheld the IBLA's decision and rejected plaintiff's claims that his property rights were taken without due process and without just compensation in violation of the Fifth Amendment. Mr. Klump subsequently appealed to the Ninth Circuit, which, in turn, affirmed the district court's decision by memorandum opinion dated December 9, 1994. *See Klump v. United States,* 43 F.3d 1479 (9th Cir.1994). Meanwhile, on May 11, 1994, Mr. Klump filed suit in this court, seeking just compensation based upon the Government's impoundment of his cattle. In his original complaint, Mr. Klump alleged that on May 20, 1992, the BLM "took or rustled 78 head of plaintiff's cattle off of private property and other leasehold property." He further alleged that "[t]he BLM used armed gunmen to cut the fence and drive the cattle from Arizona to New Mexico." He asserted that, as a result of these actions, he was entitled to compensation under the Fourth and Fifth Amendments to the United States Constitution.

On or about April 6, 1995, Mr. Klump filed an amended complaint in which he incorporated, by reference, the allegations of his original complaint and further alleged that "[on] or about April 13 and 14, 1993, the BLM rounded up ... my cattle, hauled them to Phoenix, and sold them." In support of this claim, he contended that he "is the neighbor to the Badger Den Allotment" and that his "cows walked or jumped across a cattle guard, which the BLM is responsible for." In response to the amended complaint, defendant filed a motion to dismiss and a motion for summary judgment.

On June 23, 1997, this court granted defendant's motion to dismiss plaintiff's claim arising under the Fourth Amendment to the Constitution, holding that this court lacked jurisdiction to consider this allegation. *Klump v. United States,* 38 Fed.Cl. 243, 245 (1997). The court also granted defendant's motion for summary judgment with respect to plaintiff's claim covering the 78 cattle impounded on May 20, 1992. The court noted that as to these cattle, the IBLA had held that the BLM had followed the required

procedures for impounding and selling the cattle found in trespass and that those findings had been affirmed by the U.S. District Court and the Ninth Circuit. 38 Fed.Cl. at 247. *See Klump v. Babbitt,* No. CV–94–00578–RMB (D.Ariz. May 19, 1995), *aff'd,* 108 F.3d 1385 (9th Cir.1997). The court further concluded that the impoundment and sale conducted pursuant to those regulations did not result in a compensable taking, finding, among other things, that Mr. Klump did not have a reasonable expectation that his cattle could graze without authorization on the lands in question without being impounded.

As to defendant's motion for summary judgment relating to the ten cattle impounded from the Allotment in April 1993, the court noted that Mr. Klump had not contested this impoundment before the IBLA, but indicated that "[b]ecause plaintiff is appearing *pro se* and may not be familiar with court procedures, the court will provide plaintiff with one additional opportunity to explain in detail the facts that support his case with respect to the [ten] cattle and why those facts support a different application of the Fifth Amendment's takings clause." 38 Fed. Cl. at 250. In particular, the court gave plaintiff an opportunity to demonstrate that his cattle were not on government land at the time of their seizure. Subsequently, on July 21, 1997, plaintiff filed additional contentions of fact regarding the ten cattle. On July 27, 1998, defendant filed its Motion for Reconsideration, or, in the Alternative, to Dismiss. On March 7, 2001, following transfer of this case to the undersigned judge, oral argument was heard on this motion.

At oral argument, Mr. Klump clarified that he was not arguing that either he or his brother owned the land on which the ten cattle were seized. Indeed, he indicated that he was not sure where the cattle were at that time and that they may well have been grazing on government property. Based on these representations, the court concluded that there were no additional facts bearing on this portion of the case that had not previously been considered. Accordingly, on May 3, 2001, this court held that its prior ruling in this case remained controlling. As such, it concluded that plaintiff had not demonstrated that he was entitled to just compensation on account of the impoundment

and sale of his cattle. Nonetheless, the court found that this case should not be dismissed in its entirety. Considering Mr. Klump's amended complaint, together with various statements made by the parties at oral argument,[6] the court concluded that his amended complaint could be read as contesting the amount of money that the BLM had offered as a result of the sale of the impounded cattle. In particular, Mr. Klump suggested that BLM's deductions from the sale price were excessive and, correspondingly, that the amount previously offered by the BLM as the net proceeds of the cattle sale, therefore, was too low. The court noted that the BLM regulations, found at 43 C.F.R. §§ 4150.1, *et seq.*, anticipate the payment of the sale proceeds less any costs or fines imposed upon the cattle owner, and, as such, constitute money-mandating regulations within the meaning of the Tucker Act.[7]

Trial on this issue was conducted on May 23, 2002, with closing arguments held on August 14, 2002. At trial, defendant presented the following summary of expenses it allegedly incurred in impounding the cattle on the Allotment:

### Summary of Impoundment Costs

| Summary | | Cost |
|---|---|---|
| Personnel Time: | | |
| 35 Individuals (total wages) = $ 17,562 | | |
| + 18% Overhead = $ 3,161 | | |
| Total Personnel Costs | | $ 20,723 |
| Air Craft Costs | | $ 17,134 |
| Corral Panels | | $ 4,336 |
| Horse & Trailer Rental | | $ 750 |
| Inspection Costs | | $ 85 |
| Vehicle Mileage Cost | | $ 1,484 |
| Per Diem | | $ 1,132 |
| TOTAL | | $ 45,644 |

Defendant provided various documents in support of these claimed expenses, including a hand-written summary of the hours worked by particular individuals during the period of April 12–15, 1993. Defendant did not provide any of the actual time reports filed by

these employees because those records apparently were destroyed.

In seeking to prove that the expenses claimed by defendant were excessive or should not have been incurred at all, plaintiff presented his own exhibits, buttressing them with his own testimony, that of his brother, Luther W. Klump, and that of an expert witness on ranching, Tamara G. Hurt. Based on this evidence, as well as his critique of defendant's proof and the information he elicited on cross-examination of defendant's witnesses, plaintiff argues, *inter alia,* that defendant's cost documentation is wholly inadequate. He, in particular, mounts a three-pronged attack on the largest cost items claimed by the BLM—the expenses claimed for personnel, the purchase of 60 corral panels and air craft.

## II. DISCUSSION

█ In its order of May 3, 2001, this court concluded that Mr. Klump's amended complaint, together with his allegations at oral argument, could reasonably be read as contesting the amount of money that the BLM has offered him as a result of the sale of his impounded cattle. In that order, the court found that it had jurisdiction over this matter because the BLM regulations anticipated the payment to the cattle owner of the sale proceeds less any costs or fines imposed, and, as such, constitute money-mandating regulations within the meaning of the Tucker Act. *See* 43 C.F.R. §§ 4150.1, *et seq.* It now falls on plaintiff to prove, by a preponderance of the evidence, that the costs incurred by defendant were either excessive in amount or should not have been incurred at all. *See generally* 21 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5122 at p. 555–56 (1977). Viewed as such, the court will consider the various assertions made by plaintiff on a category-by-

---

6. Regarding this issue, the court noted, in a footnote, that "at oral argument, government counsel indicated that the regulations in question require the Department of the Interior to pay Mr. Klump the net proceeds of the sale and offered to provide the court with evidence to support the deductions Interior made against the gross proceeds of the sale."

7. 43 C.F.R. § 4150.1(b) (1993) provided that: "[v]iolators shall be liable in damages to the

United States for the forage consumed by their livestock, for injury to Federal property caused by their unauthorized grazing use, and for expenses incurred in impoundment and disposal of their livestock, and may be subject to civil penalties or criminal sanction for such unlawful acts." The procedures for conducting the impoundment and auction of the cattle are found at 43 C.F.R. §§ 4150.1 *et seq.* (1993).

category basis, rendering additional factual findings as are helpful and necessary.

## A. Personnel

At trial, defendant introduced a hand-written chart that had been prepared by a BLM official responsible for tracking the costs of the impoundment. This chart indicated that at least 50 individuals participated in the impoundment of plaintiff's ten cattle and the 289 cattle owned by his brother and other individuals. The chart further indicates (and testimony confirms) that the BLM did not bill the cattle owners for the time of fifteen of these individuals, who were involved in perimeter security. As to the remaining 35 individuals for whom the BLM did charge costs, the following chart summarizes four categories of information (*i.e.*, the name, hours worked, hourly rate, and total amount billed by these individuals) that may be drawn or extrapolated from the hand-written chart:

| Name | Total Hours | Hourly Rate | Total Billed |
|------|------|------|------|
| Brandau | 43 | $ 20.48 | $ 880.64 |
| Walls | 33.5 | $ 17.37 | $ 581.90 |
| Rietz | 13 | $ 21.01 | $ 273.13 |
| Bickham | 46 | $ 12.50 | $ 575.00 |
| Bernal | 46 | $ 12.01 | $ 552.46 |
| Carry Templin | 21 | $ 13.36 | $ 280.56 |
| Drobka | 34 | $ 16.70 | $ 567.80 |
| Terry | 34 | $ 19.94 | $ 677.96 |
| McReynolds | 32.5 | $ 15.60 | $ 507.00 |
| Othon | 6 | $ 10.81 | $ 64.86 |
| Humphrey | 45 | $ 20.48 | $ 921.60 |
| McRae | 48.5 | $ 20.48 | $ 993.28 |
| Whitmer | 43 | $ 16.48 | $ 708.64 |
| Gacey | 41 | $ 20.48 | $ 839.68 |
| Wood | 4.5 | $ 5.72 | $ 25.74 |
| Silva | 4.5 | $ 11.14 | $ 50.13 |
| Miranda | 6 | $ 10.48 | $ 62.88 |
| Sanchez | 6 | $ 5.72 | $ 34.32 |
| Stone | 6 | $ 13.81 | $ 82.86 |
| Merchant | 6 | $ 13.81 | $ 82.86 |
| Clay Templin | 46.5 | $ 15.14 | $ 704.01 |
| Packer | 6 | $ 5.72 | $ 34.32 |
| Benson | 52 | $ 14.72 | $ 765.44 |
| Bartmuss | 51 | $ 14.20 | $ 724.20 |
| Sandness Huck | 51 | $ 14.20 | $ 724.20 |
| McLaughlin | 53 | $ 19.37 | $ 1,026.61 |
| Templeton | 41 | $ 14.25 | $ 584.25 |
| Duncan | 30.5 | $ 19.40 | $ 591.70 |
| Salazar | 30.5 | $ 8.82 | $ 269.01 |
| McCurley | 53 | $ 21.02 | $ 1,114.06 |
| Gilbert | 24 | $ 19.40 | $ 465.60 |
| Estrada | 29 | $ 9.40 | $ 272.60 |
| Modina | 29 | $ 14.70 | $ 426.30 |
| Arrietta | 31.5 | $ 9.11 | $ 286.97 |
| Hall | 33.5 | $ 17.24 | $ 577.54 |
| **TOTAL** | | | **$17,330.11** |

8. The actual numbers on the chart submitted by defendant were slightly different. The court has corrected the numbers to remedy what appear to be minor mathematical errors.

To the total of $17,330.11 indicated above, the BLM added an 18 percent administrative overhead charge, allegedly to recover the costs incurred in time record and payroll accounting at its Denver, Colorado business center. The addition of this $3,119.42 in overhead resulted in a final personnel cost of $20,449.53.[8]

At this point, the waters get decidedly murkier. The chart actually entered into evidence by defendant—a copy of which is attached to this opinion—purports to reflect the actual number of hours allegedly worked on particular days by the various individuals listed thereon. As described in greater detail below, these hourly figures, however, are tracked differently from page to page of the document. The specific figures listed under the various columns also raise many unanswered questions.

The first page of the chart lists the names and hourly rates of 21 of the individuals involved in the impoundment, 20 of which were billed to the ranchers. It summarizes the hours that they worked in two columns— one labeled "4/12–13" and the other "4/14–15"—apparently referring to time spent on April 12–13, 1993, and on April 14–15, 1993, respectively.[9] Some of the hour figures listed for April 12–13, 1993, are very high—for example, one individual lists 29 hours for those two days, while two others list 27 hours. But there is no information available that allows the court to determine how many hours were worked by these individuals on one of these days versus the other.

The second page of the same chart also lists the names and hourly rates of 22 additional individuals, 10 of which were billed. But, unlike the first page, it lists the time expended in three columns (rather than the two identified above), labeled, respectively, "4–13," "4–14" and "4–15," thus seemingly corresponding to time spent on April 13, 14 and 15 of 1993, respectively. The entries on

9. The "2" in the listing that apparently refers to "4/12" is written over and very blotchy, yet the court believes that the document reasonably can be read as referring to April 12.

this chart, however, are problematic for several reasons. First, a number of the entries listed for April 13, 1993, exceed 24 hours (*e.g.*, 35 hours) and thus suggest either a breach of the time/space continuum [10] or, more likely, that, despite the heading, the figures relate to more than one day. Second, a number of these listings are again extraordinarily high, even if they refer to two days, rather than one. For example, several individuals apparently billed in excess of 34 hours for these two days and in excess of 53 hours for the three-day period from April 12–15, 1993. This trend continues in several of the entries for the security personnel—costs that the BLM did not bill, but which, nonetheless, raise questions concerning the accuracy of this document. Six of these individuals billed 36 hours or more for April 12–13, 1993, and several billed in excess of 60 hours for the three days of April 12–14, 1993, with one billing a whopping 63 hours, or an average of 21 hours per day, over this three-day period.

The final page of the chart also lists the names and hourly rates of seven individuals, five of which were billed to the ranchers. But unlike the first two pages, it lists the time expended in two columns, labeled with the single overarching heading of "4–13 thru 4–15," and thus seemingly referring to time spent on April 13–15, 1993. Again nothing in the record indicates the actual time worked by these individuals on particular days and the totals again are very high, with one individual allegedly working 57.5 hours over these three days.

Accordingly, the three scribbled pages that constitute the chart supplied by the BLM each are differently arrayed, raising at least some question as to whether they were generated contemporaneously. They do share some things in common—each contains columns and entries that make no sense on their face and leave unanswered questions regarding the hours actually worked on particular days. Each page also provides absolutely no indication as to what services were rendered by the listed individuals and thus how much time was spent individually or cumulatively on particular tasks. Defendant attempted to address these problems through the testimony of several witnesses—but that testimony, in fact, merely adds to the court's conundrum.

Three of defendant's witnesses were directly involved with the impoundment—Clay Templin, now a BLM supervisor, was a wrangler on the impoundment, as was John McLaughlin, while Larry H. Humphrey was the commander of the operation. Under cross-examination by Mr. Klump, Messrs. Templin and Humphrey both attempted to identify the various functions served by the non-security personnel assigned to the impoundment. The results of their somewhat differing accounts are reflected in the following chart:

| Name | Templin | Humphrey |
| --- | --- | --- |
| Brandau | Accompanied cattle to Phoenix | Corral & accompanied cattle to Phoenix |
| Walls | Accompanied cattle to Phoenix | Corral & accompanied cattle to Phoenix |
| Rietz | Corral | Corral |
| Bickham | Dispatcher | Dispatcher |
| Bernal | Helicopter Mgr. | Helicopter Mgr. |
| Carry Templin | Media | Media |
| Drobka | Media | Media |
| Terry | Documentation | Corral & documentation |
| McReynolds | Documentation | Corral & documentation |
| Othon | Procurement | Procurement |

10. *See generally,* Stephen W. Hawking, A Brief History of Time: From the Big Bank to Black Holes (1988).

| | | |
|---|---|---|
| Humphrey | Commander | Commander |
| McRae | Corral | Corral |
| Whitmer | Corral | Corral & documentation |
| Gacey | Corral | Corral & documentation |
| Wood | Answer phones | Did not know |
| Silva | Dispatcher | Procurement |
| Miranda | Dispatcher | Documentation |
| Sanchez | Dispatcher | Dispatcher |
| Stone | Documentation | Corral |
| Merchant | Maps | Dispatcher |
| Clay Templin | Wrangler | Wrangler |
| Packer | Administration | Administration |
| Benson | Wrangler | Wrangler |
| Bartmuss | Wrangler | Wrangler |
| Sandness Huck | Wrangler | Wrangler |
| McLaughlin | Wrangler | Wrangler |
| Templeton | Wrangler | Wrangler |
| Duncan | Wrangler | Wrangler |
| Salazar | Wrangler | Wrangler |
| McCurley | Wrangler | Wrangler |
| Gilbert | Corral/Water | Did not know |
| Estrada | Corral/Water | Corral |
| Modina | Corral | Corral |
| Arrietta | Corral | Did not know |
| Hall | Aviation Officer | Dispatcher |

Both witnesses readily identified the BLM employee who generated the summaries as a Mr. Terry, who is still employed by the BLM at its Lakeview, Oregon, office; for reasons unexplained, however, Mr. Terry did not testify. They also agreed that Mr. Terry's summaries were based upon individual time sheets turned in by each employee at the end of each day of the impoundment. Mr. Humphrey, indeed, testified that there were two sets of such sheets—a rough sheet, using a form normally employed by BLM fire fighters, prepared by the employee during the course of the day, and a more formal time sheet submitted at the end of the day.[11] He also revealed that while the formal time sheets had been shipped to the BLM's Denver, Colorado, office for processing, copies thereof, as well as the rough sheets, had been preserved in the Safford, Arizona, office's files. None of these documents, however, were produced during discovery or at trial. Mr. Templin and Mr. Humphrey speculated that the original time sheets in Denver had been destroyed in 1998 under the BLM's five-year documentation retention policy. Neither witness, however, explained why documents that should have been in the Safford office's files—not only the time sheets, but other planning documents that would have indicated who was assigned to various tasks—were missing.[12] These same

11. Mr. McLaughlin added further confusion to this matter indicating that he was unsure whether he turned in daily time sheets, but had filled out a weekly activity sheet.

12. Regarding these time sheets, Mr. Templin testified–

files, of course, yielded many of the documents that defendant used to support its case.

The testimony of the BLM officials thus served only to confirm that the available documentation of the personnel costs for the impoundment is woefully inadequate. Even so, it is difficult to assess the legal impact of the quality of the records supplied here and the fact that more detailed records are missing. On the one hand, the burden of proof in this case remains squarely on the shoulders of the plaintiff, despite the fact that some of the omissions in the record plainly weigh against him. Indeed, in this circuit, the fact that the BLM destroyed evidence does not, absent some proof of bad faith, warrant an inference that that evidence was adverse to the BLM. *See Eaton Corp. v. Appliance Valves Corp.*, 790 F.2d 874, 878 (Fed.Cir. 1986); *Slattery v. United States*, 46 Fed.Cl. 402, 405 (2000).[13] To be sure, such bad faith may be inferred from the " 'totality of the circumstances,' " *Slattery*, 46 Fed. Cl. at 405 (quoting *S.C. Johnson & Son, Inc. v. Louisville & Nashville Railroad Co.*, 695 F.2d 253, 259 (7th Cir.1982)). But, while the circumstances here certainly hint at bad faith, this court ultimately refrains from making such a finding primarily because the need for the

missing records was not apparent until 2001, eight years after the records were generated, when plaintiff's trial theory first became clear. Nonetheless, the BLM seemingly must bear some responsibility to ensure that the costs it charges against auction proceeds are actually incurred and reasonably related to the impoundment. Certainly, the BLM's regulations do not condone the gilding of an impoundment operation, even where the additional costs are to be borne by someone viewed by agency officials as nettlesome or litigious.

■ Ultimately, however, the court believes that major adjustments of the personnel costs are warranted based not upon bad faith or shifting presumptions, but the facts in the record.[14] For example, combining and sorting the testimony of Messrs. Templin and Humphrey, it appears that as many as thirteen individuals, with billings totaling a stunning 408 hours, participated in the assembly and disassembly of the temporary corral used to store the cattle before they were moved to Phoenix. The corral, however, was neither constructed of brick and mortar nor structural steel, but rather consisted of 120 12' × 5' panels, each weighing approximately 60 pounds. The panels were erected,

Well, there was time sheets that were done at the time. And what happens is since we had no idea that we would be here nine years later after this thing we did not make copies of those individual time sheets. And as this case came to the forefront and we were asked to produce records I talked to our time person that was there in Safford and I specifically asked is there a way I can get copies of our time sheets? And I was told at that point that, no, the paper copies that were in our office were transferred to Denver and that the Denver office has only a five year retention policy as far as keeping documents and they were not available.

Mr. Templin later testified that he did not actually know whether the documents had been destroyed in 1998 or earlier. In his testimony, Mr. Humphrey believed that the original time sheets in Denver had been destroyed, but surmised (incorrectly) that there were copies in Safford which had been introduced into evidence.

13. There is considerable tension between *Eaton* and the holding in *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1572–73 (Fed.Cir.1996), in which the Federal Circuit held that "it is not necessary to establish bad faith in order to draw

an adverse inference from 'purposeful action.' " In that patent case, one of the parties, Aerosonic, had destroyed its manufacturing records after the litigation began and the court held that Aerosonic's actions warranted adverse inferences. In some ways, the possible intracircuit conflict between *Eaton* and *Sensonics* reflects the true broader intercircuit split regarding whether mere negligence or unintentional conduct in spoliating evidence is enough to warrant an adverse inference. *See Slattery*, 46 Fed.Cl. at 405 (citing cases); *see also* David A. Bell, Margaret M. Koesel & Tracey L. Turnbull, "Let's Level the Playing Field: A New Proposal for Analysis of Spoliation of Evidence Claims in Pending Litigation," 29 Ariz. St. L.J. 769, 789–90 (1997). The court need not dive gratuitously into this morass as it believes, for the reasons that follow, that the application of an adverse inference would make no difference in the ultimate result reached here.

14. As was stated in one old case, " '[p]resumptions' ... may be looked on as the bats of the law, flitting in the twilight but disappearing in the sunshine of actual facts." *Mackowik v. Kansas City, St. Joseph & Council Bluffs R.R.*, 196 Mo. 550, 571, 94 S.W. 256 (1906).

without a foundation, in the middle of a field and latched together, without tools, by simply dropping two preattached pins into two preattached eyelets. Plaintiff testified uncontrovertedly that it would take three individuals about 20 seconds to link together two such panels.[15] According to defendant's records, however, the BLM employees took approximately 3.4 *hours* to set up and take down each panel. Even allowing for some time to transport the panels to and from Safford, and to drop them off and stack them up on the back of a truck—and even if the cited individuals performed some other limited tasks—it is beyond peradventure that the time billed by the BLM for erecting and disassembling the corral is, in a word, excessive.

Accordingly, plaintiff has proven that the time records submitted by defendant grossly misstate the time attributed to the temporary corral. Since no basis exists upon which to estimate the actual time expended on this task, the court will disallow the personnel costs attributed to any individual identified as working on the corral. This finding shall apply even as to individuals who purportedly participated on more than one activity (*e.g.*, corral work and "documentation"), as the court has no basis from which to allocate time to the tasks unrelated to the corral. Therefore, the court finds that the time billed by the following individuals does not represent a proper cost of the impoundment chargeable to Mr. Klump: Brandau, Walls, Reitz, Terry, McReynolds, McRae, Whitmer, Gacey, Stone, Gilbert, Estrada, Modina, and Arrietta.

■ The court also finds that plaintiff has proven that the time spent by several other BLM employees is not reasonably related to the impoundment. First, the court rejects the notion that the salary for Ms. Templin and Ms. Drobka, who worked on media relations, should be imposed on plaintiff. While the BLM understandably may have wanted to portray its actions in the best light, its public relation concerns are not matters, in the court's view, reasonably related to the

impoundment itself. In addition, based upon the poor documentation and conflicting testimony, the court also disallows the time associated with several individuals who allegedly performed procurement and mapping services. The testimony indicates that these activities were performed before April 12, 1993, while the summary document indicates that the same activities were performed between April 12–15, 1993. Based on this conflict, and with no evidentiary basis to determine whether the time listed in the summary chart actually corresponds to those dates or some other dates, the court concludes that Mr. Klump has demonstrated that the time of the following individuals was not related to the impoundment activities occurring during the April 12–15 period: Othon, Silva and Merchant.

■ Not all of plaintiff's slings and arrows, however, strike home. First, while the personnel records here are woeful, the court believes that the record, as a whole, supports the time claimed by the wranglers and dispatchers. In this regard, Messrs. Templin, Humphrey and McLaughlin provided enough detail regarding the activities of these individuals to support the hours claimed. Based on the same testimony, the court also refuses to strike various hour figures listed for the wranglers on the BLM's chart—for example, the testimony supports the conclusion that time listed in excess of 24 hours for April 13, 1993, was properly billed to April 12 and 13. The court also rejects plaintiff's claim that the wrangling could have been performed by day workers at $50 per day because there was no evidence that such cowboys would be suitable or willing to work on an impoundment with security concerns. Based on this finding, the court also concludes that the time of the wranglers may be billed at their normal hourly salary rates, despite the fact that these rates exceeded what a day worker might have charged. In the court's view, the BLM was compelled to use those of its employees that had the requisite wrangling skills and thus did not act unreasonably in

---

15. Mr. Klump testified, "It's so simple to put them up. You can just pick them up. They're really light and they are easy to put up."

seeking reimbursement for those individuals at their normal hourly rates.

The following chart takes into account the findings rendered above in retabulating the amount of basic personnel costs that ratably should be imposed on plaintiff:

| Name | Total Hours | Hourly Rate | Total Billed |
|------|-------------|-------------|--------------|
| Bickham | 46 | $ 12.50 | $ 575.00 |
| Bernal | 46 | $ 12.01 | $ 552.46 |
| Humphrey | 45 | $ 20.48 | $ 921.60 |
| Wood | 4.5 | $ 5.72 | $ 25.74 |
| Miranda | 6 | $ 10.48 | $ 62.88 |
| Sanchez | 6 | $ 5.72 | $ 34.32 |
| Clay Templin | 46.5 | $ 15.14 | $ 704.01 |
| Packer | 6 | $ 5.72 | $ 34.32 |
| Benson | 52 | $ 14.72 | $ 765.44 |
| Bartmuss | 51 | $ 14.20 | $ 724.20 |
| Sandness Huck | 51 | $ 14.20 | $ 724.20 |
| McLaughlin | 53 | $ 19.37 | $ 1,026.61 |
| Templeton | 41 | $ 14.25 | $ 584.25 |
| Duncan | 30.5 | $ 19.40 | $ 591.70 |
| Salazar | 30.5 | $ 8.82 | $ 269.01 |
| McCurley | 53 | $ 21.02 | $ 1,114.06 |
| Hall | 33.5 | $ 17.24 | $ 577.54 |
| | | TOTAL | $ 9,287.34 |

■ Finally, the court does not believe that the 18 percent administrative overhead charge applied by the BLM to its personnel costs is a proper cost of the impoundment. One might argue, indeed, that the BLM should not receive reimbursement for any of its personnel as they would have been paid whether they participated in the impoundment or not. The court, however, believes that it is reasonable to require the ranchers to reimburse the costs for personnel who properly worked on the impoundment on the theory that those individuals were thereby precluded from performing their normal BLM duties. That rationale does not extend to the 18 percent administrative overhead charge, which is a budget convention employed by the BLM to cover the costs of processing its payroll. There is no indication in the record that any additional payroll processing services were rendered here as a result of the impoundment. Rather, by all appearances, the individuals dedicated to that task at the BLM's Denver office simply processed the time sheets for the impoundment the same way they would have processed the time sheets corresponding to a normal work week. Accordingly, the court disallows the 18 percent overhead charge that the BLM billed to the ranchers.

Recapping, based on its findings the court concludes that defendant is entitled to personnel costs of only $9,287.34, representing a $11,162.09 diminution from the amount originally charged by the BLM.[16]

### B. Corral Purchase

■ The BLM also deducted $4,336 from the cattle proceeds for 60 corral panels it purchased from J.D. Feed & Supply in Safford, Arizona. The BLM officials testified that they attempted to, but could not find, a supplier from which to lease the panels and then purchased the panels as a last resort. The panels purchased were combined with approximately 60 other panels that the BLM borrowed from various sources in order to construct the 120–panel temporary corral. After the impoundment, the BLM kept the 60 corral panels it had purchased, storing them at one of its offices.

Plaintiff testified that there was no need to erect the temporary corral because there are two corrals near the Allotment which could have been used temporarily to store the cattle—one owned by plaintiff's brother, Walter, and the other by a neighbor, Peter Brawley. His testimony in this regard is consistent with that of his brother, Luther, and Ms. Hurt. The latter further indicated that one set of these pens—she did not actually indicate which—was on BLM property and approximately a half-mile from where the cattle were gathered in 1993. There was no indication, however, that any of these property owners—certainly not plaintiff's brother— would have been willing to allow the BLM to use their pens in the impoundment.[17] To the

**16.** Defendant undoubtedly could contend that it failed to charge personnel costs that might have reasonably been imposed upon the ranchers, for example, the cost of security or costs incurred outside the four-day period of the actual impoundment. For whatever reasons, however, the BLM chose not to impose those costs and, under those circumstances, and particularly given the sorry state of the cost records submitted by defendant, this court will not, *sua sponte*, inject issues as to these costs into this case.

**17.** Mr. Templin testified that the BLM had asked Mr. Brawley whether they could use his corral and that he had declined. Mr. Templin, however, admitted that he did not have personal knowledge of this. The court, therefore, does not credit his testimony in this regard.

contrary, plaintiff readily conceded that the reason the BLM had to auction the cattle in Phoenix is because no local rancher would likely participate in an auction stemming from an impoundment. This suggests that any attempt by the BLM to use the preexisting corrals would have been fruitless.

The court, nonetheless, finds that it was unreasonable for the BLM to purchase the corral panels, charge the entire cost to the ranchers, and then keep the panels for its further use. Indeed, the agency's retention and storage of the panels, rather than selling or donating them, suggest that it believes that they may be put to future use, perhaps in other impoundments in Arizona or in neighboring states, such as Nevada. Plaintiff's expert, Ms. Hurt, testified that, at a minimum, the BLM should have charged Mr Klump only a ratable portion of the cost of the corral panels, based upon an assumed useful life of ten years. While Ms. Hurt was not certified as an expert on impoundments, in the court's view, her testimony on this point was convincing and leads the court to find that only 10 percent of the cost of the panels, or $433.60, should have been charged to the ranchers. This figure is derived by attributing one year of the ten-year useful life of the panels to the impoundment at issue. The record does not support a greater diminution of this charge.

Accordingly, based on its findings, the court concludes that defendant is entitled to be reimbursed only $ 433.60 for the corral panels it purchased, representing a diminution of $ 3,902.40 from the amount originally charged by the BLM.

## C. Air Craft

■ In March of 1993, the BLM twice employed aircraft (first, a fixed wing aircraft and then a helicopter) to determine if cattle were still illegally grazing on the Allotment. It charged the ranchers $900 for the use of this aircraft. Then, between April 12 through 15, 1993, the BLM simultaneously employed three helicopters in herding and impounding the 299 cattle. The first of these helicopters was a "command and control" helicopter used by Larry Humphrey to locate stray cattle and guide the wranglers around the boundaries of private lands. The second helicopter was a "hazing" helicopter used to direct the cattle and help the wranglers herd the cattle. The third helicopter was for security and provided by the Arizona Department of Public Safety (DPS); as to this helicopter, only fuel costs were charged to the impoundment. Overall, including the March flights, the BLM billed the ranchers air operation costs totaling $17,134, of which approximately $8,153 was attributable to Mr. Humphrey's "command and control" helicopter.[18]

18. The BLM provided two sets of records explaining the summation of the aircraft costs: allegedly contemporaneous, hand-written records by a BLM official (most likely Mr. Terry) and a summary sheet prepared by the Office of Aircraft Services of the Department of the Interior. Although the information in these records did not match up, several more detailed observations may be made therefrom.

As noted above, according to the handwritten records, on March 3, 1993, the BLM employed a helicopter for a one-hour flight to the allotment to determine whether the cattle were still present, resulting in a cost of $350, then conducted a *second one-hour flight to reconfirm on March 24*, assessing a cost of $550.

For the actual herding of the cattle on April 12, 1993, the hand-written records report that the aircraft operation cost was $3,168.25 and the fuel cost for the Department of Public Safety ("DPS") helicopter (requested by the BLM's law enforcement division) was $71.75, resulting in a total of $3,240. The defendant's recorded figures show that the sum of the costs on the 12th and 13th was $8,742.82, then adds an unex-

plained amount of $150 as a "misc" charge for a total of $8,892 for the 12th and 13th. On April 13, the aircraft cost was $5,100.50 with a DPS fuel charge of $402.32, yielding a total of $5,502.82. On April 14, the aircraft operation cost was $4920 while the DPS fuel cost was $304.98, for a total of $5,224.98. On April 15, 1993, the aircraft operation cost was $2,045.25 for the aircraft and $71.75 for the DPS helicopter's fuel costs, for a total of $2,117. The grand total for the costs of the helicopters and the DPS fuel on these dates was $17,133.98, which the BLM appears to have rounded up to $17,134.00 on both the aircraft costs sheet and the summary *of impoundment costs sheet.*

The Office of Aircraft Services' summary sheets provide a more detailed description of the aircraft costs, dividing the costs according to flight time and service truck costs per helicopter. The total cost for the two helicopters on April 12 was $2,972.50; the total cost on April 13 was $6,023.30; the total cost on April 14 was $5,508.73; and the total cost on April 15, was $2,449.02. These figures roughly correspond to the figures provided in the handwritten records,

Based on her experience in using helicopters to gather cattle, Ms. Hurt convincingly testified that only a single helicopter was necessary to assist with the round-up. She indicated that she had often used her helicopter to gather cattle over an area much larger than that of the Allotment. In his testimony, Mr. Humphrey could not explain what function his helicopter provided that, in the court's view, could not have been provided either by the herding helicopter or the DPS helicopter. More specifically, while he suggested that the primary purpose of the "command and control" helicopter was to keep the wranglers from passing onto private property, the record indicates that limited function could have been readily accomplished by the other two helicopters and the security personnel that ringed the Allotment. Moreover, no reason was given why Mr. Humphrey could not have performed his "command and control" functions while riding in one of these other air craft. Based on the record, the court thus finds that the cost of the "command and control" helicopter was not properly attributable to the impoundment.[19]

Accordingly, based on its findings, the court concludes that defendant is entitled to be reimbursed only $8,981 for its use of air craft, representing a diminution of **$8,153** from the amount originally charged by the BLM.

### D. Redux

Based on the foregoing, the court believes that the following chart captures the costs that should have been billed by the BLM as attributable to the impoundment.

**Summary of Impoundment Costs**

| Summary | Cost |
| --- | --- |
| Personnel Costs | $ 9,287 |
| Air Craft Costs | $ 8,981 |
| Corral Panels | $ 433 |
| Horse & Trailer Rental | $ 750 |
| Inspection Costs | $ 85 |
| Vehicle Mileage Cost | $ 1,484 |
| Per Diem | $ 1,132 |
| **TOTAL** | **$ 22,152** |

Accordingly, the impoundment cost per animal was not $152.65, but rather $74.09. Plaintiff's share of these costs for his ten cattle thus was not $1,526.50, but rather $740.90.[20]

### III. CONCLUSION

Together, the embarrassingly sloppy nature of the documentation provided by the BLM and the destruction—only partially explained—of various agency records that might have assisted plaintiff in making his case, not to mention the gap-filled testimony offered by the BLM officials, border on demonstrating that the BLM acted in bad faith here. Ultimately, however, the record comes up short on this count, leaving the court with suspicions, but no firm view that the deficiencies in this record are attributable to bad faith, as opposed to a lack of due care. The BLM, however, should draw little solace from this finding as it is on notice that future courts may not treat similar slipshod accounting and lost records so kindly.[21]

In the end, this case is driven by the record, viewed strictly through the prism of the plaintiff's burden of proof. Keenly aware of that burden, and carefully considering all the evidence, the court finds that plaintiff is entitled to be paid $ 2,611.48, corresponding to the net proceeds from the auction of his cattle ($3,442.10) less the costs properly at-

which list the totals as $3,240 for the 12th, $5,502.82 for the 13th, $5,224.98 for the 14th, and $2,117 for the 15th. These records allow the court to isolate the costs associated with particular aircraft, indicating, for example, that the total cost of the command helicopter was $8,152.65.

19. In her expert report, Ms. Hurt also argued that defendant incurred unnecessary costs in flying the helicopters to and from the site, rather than trucking them to the locations where they were needed. Ms. Hurt, however, failed to adequately quantify any savings associated with this association, particularly, as it is not clear that the larger types of helicopters used by the BLM could be trucked in the fashion she claimed and,

especially, as it is not clear that such trucks were readily available.

20. Plaintiff's expert, Ms. Hurt, challenged several other cost items, including the vehicle and per diem expenses listed by the BLM. Reviewing her testimony, however, the court finds that plaintiff has not met his burden of demonstrating that these expenses were excessive.

21. Lest a different impression be left, the court hastens to add that defendant's trial counsel has, throughout these proceedings, acted only consistent with the highest standards of professionalism and ethics.

tributable to the impoundment ($740.90) and the settlement of the trespass claim ($89.72). The Clerk shall enter an appropriate judgment. Costs to plaintiff. See RCFC 54(d).

IT IS SO ORDERED.

EXHIBIT C

| | Rate | Hours Thru 4/13 | 7/14-15 | total |
|---|---|---|---|---|
| Brandau | 20.48 | 21.5 | 18 ± 3.5 | 880.64 |
| Walls | 17.37 | 14 | 16 + 3.5 | 581.90 |
| Rietz | 21.01 | 6 | 7 | 273.13 |
| Bickham | 12.50 | 27 | 19 | 575.00 |
| Bernal | 12.01 | 27 | 19 | 552.46 |
| Carry Templin | 13.36 | 10 | 11 | 280.56 |
| Drobka | 16.70 | 21 | 13 | 567.80 |
| TERRY | 19.94 | 15.5 | 18.5 | 677.96 |
| McReynolds | 15.60 | 15.5 | 17 | 507.00 |
| Othon | 10.81 | 6 | — | 64.86 |
| Humphrey | 20.48 | 29 | 16 | 921.60 |
| McRae | 20.48 | 23 | 17.5 + 8 | 993.28 |
| Whitmer | 16.48 | 23.5 | 19.5 | 708.64 |
| Gacey | 20.48 | 25.5 | 15.5 | 839.68 |
| ~~Wohlberg~~ | ~~17.37~~ | ~~26~~ | ~~11.5~~ | |
| Wood | 5.72 | 4.5 | — | 25.74 |
| Silva | 11.14 | 4.5 | — | 50.13 |
| Miranda | 10.48 | 6 | — | 62.88 |
| Sanchez | 5.72 | 6 | — | 34.32 |
| Stone | 13.81 | 0 | 6 | 82.86 |
| Merchant | 13.81 | 0 | 6 | 82.86 |

| | Rate | Hrs 4-13 | 4-14 | 4-15 | |
|---|---|---|---|---|---|
| Clay Templin | 15.14 | 29 | 17.5 | | 704.01 |
| Packer | 5.72 | 0 | 6 | | 34.32 |
| Montijo | 17.?? SO | 29 | 15 | | |
| Rogers | 25.34 | 33 | 37 | | |
| Benson | 14.72 | 28 | 15 | 9 | 765.44 |
| Bartmuss | 14.20 | 27 | 15 | 9 | 724.20 |
| Sandness Huck | 14.20 | 27 | 15 | 9 | 724.20 |
| McLaughlin | 19.37 SO | 35 | 18 | | 1026.61 |
| Templeton | 14.25 | 26 | 15 | | 584.25 |
| Duncan | 19.40 | 14 | 16.5 | | 591.70 |
| Salazar | 8.82 | 14 | 16.5 | | 269.01 |
| McCurley | 21.02 SO | 34 | 19 | | 1114.06 |
| Winn | 13.70 | 31 | | | |
| Lum | 14.25 | 35 | 17 | | |
| Cone | 17.37 | 40 | 23 | | |
| Armstrong | 17.?4 | 34 | 22 | | |
| Stuart | 19.37 SO | 35 | 19 | | |
| Teaford | 14.70 | 36.5 | 19 | | |
| Olson | 21.31 SO | 31 | 20 | | |
| Rheiner | 13.36 | 37 | | | |
| Dorsey | 16.70 | 36 | 15.5 | | |
| Wadsworth | 14.25 | 38 | 13.5 | | |

| | Rate | 4-13 | Thru 4-15 | |
|---|---|---|---|---|
| Gilbert | 19.40 | 11 | 13 | 465.60 |
| ~~Brown~~ | | 37 | 20.5 | |
| Estrada | 9.40 | 15 | 14 | 272.60 |
| Medina | 14.70 | 15 | 14 | 426.30 |
| Arrietta | 9.11 | 15 | 16.5 | 286.97 |
| ~~Ruiz~~ | 16.16 ᴮᴴᵛ | 33 | 20.5 | |
| Hall | 17.24 | 14 | 19.5 | 577.54 |
| | | | | 17,562.11 |

X 18% BLM Admin
Overhead Charge     3,161.18

20,723.29